NO. 19-2419

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**GLEN K. ALLEN,**

*Plaintiff-Appellant*,

v.

**HEIDI BEIRICH, MARK POTOK, and**
**THE SOUTHERN POVERTY LAW CENTER, INC.,**

*Defendants-Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND, NO. 1:18-CV-03781-CCB**

## BRIEF OF DEFENDANTS-APPELLEES

Chad R. Bowman
Elisabeth R. Connell
Maxwell S. Mishkin
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
bowmanchad@ballardspahr.com
connelle@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Local Rules of the Fourth Circuit, Defendant-Appellee Southern Poverty Law Center, Inc. ("SPLC") certifies that it is a registered nonprofit organization, that it has no parent corporation, and that no publicly held corporation owns ten percent or more of it.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ..........................................i

TABLE OF AUTHORITIES ...................................................iv

COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..........1

PRELIMINARY STATEMENT .................................................2

COUNTERSTATEMENT OF THE CASE.........................................3

I.      THE PARTIES ....................................................3

II.     THE NEWSGATHERING AT ISSUE ..............................5

III.    THE RELEVANT SPLC PUBLICATIONS.........................6

     A.      "Chaos at the Compound"...................................6

     B.      The Article....................................................7

     C.      The Hate Map and Hate Map Flyer........................9

IV.     ALLEN'S COMPLAINT ......................................10

V.      THE LITIGATION BELOW ...................................11

SUMMARY OF ARGUMENT .................................................13

ARGUMENT ..................................................................14

I.      THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S
        DECLARATORY JUDGMENT ACT CLAIM............................16

II.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT
        SPLC'S NEWSGATHERING ACTIVITY IS PROTECTED BY THE
        FIRST AMENDMENT UNDER THE *BARTNICKI* DOCTRINE...............19

     A.      Allen Misapprehends the *Daily Mail-Bartnicki* Doctrine...................20

     B.      Allen's Attempts to Distinguish *Bartnicki* Fail...................................25

          1.      Alleged Involvement in Theft..................................26

          2.      Alleged Special Duties............................................28

3.    A Supposed Balancing Test .....................................29

III.   THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S
       TORT CLAIMS BECAUSE THEY CHALLENGE SPEECH
       THAT IS PROTECTED BY THE FIRST AMENDMENT ........................30

       A.    Allen Fails to State a Claim for Defamation ......................31

             1.    The text at issue is a non-actionable use of rhetorical
                   hyperbole....................................................32

             2.    Allen cannot pass the rigorous test for libel-by-
                   implication claims ...........................................34

             3.    Any implication here is an opinion based on
                   disclosed facts. ..............................................35

       B.    Allen Cannot Make An "End Run" Around The First
             Amendment Merely By Asserting Tag-Along Tort Claims ..............36

       C.    The First Amendment Bars Allen's Unjust Enrichment
             Claim ................................................................40

IV.    THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S
       RICO CLAIMS ON CONSTITUTIONAL AND OTHER
       GROUNDS ...............................................................42

       A.    Beirich And Potok Did Not Commit Any RICO Predicate
             Acts..................................................................43

       B.    Allen Also Failed To Allege Any Pattern Of Racketeering
             Activity .............................................................48

V.     THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S
       CONTRACTUAL CLAIMS BECAUSE HE WAS NOT A
       PARTY TO OR INTENDED BENEFICIARY OF THE
       RELEVANT CONTRACT.................................................49

CONCLUSION ...................................................................55

CERTIFICATE OF COMPLIANCE................................................56

CERTIFICATE OF SERVICE ....................................................57

iii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................14, 15, 45

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001).....................................................*passim*

*Batson v. Shiflett*,
   325 Md. 684 (1992) ...........................................................33

*Beck v. Prupis*,
   529 U.S. 494 (2000)...........................................................42

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................45

*Beverly Hills Foodland, Inc. v. United Food and Commercial Workers
   Union, Local 655*, 39 F.3d 191 (8th Cir. 1994) ....................................37

*Biospherics, Inc. v. Forbes, Inc.*,
   151 F.3d 180 (4th Cir. 1998) .......................................................15, 36

*Biro v. Condé Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..............................................36

*Bob Jones Univ. v. Simon*,
   416 U.S. 725 (1974)...........................................................18

*Boehner v. McDermott*,
   441 F.3d 1010 (D.C. Cir. 2006).....................................................23

*Boehner v. McDermott*,
   484 F.3d 573 (D.C. Cir. 2007).....................................................24, 28

*Bowley v. City of Uniontown Police Dep't*,
   404 F.3d 783 (3d Cir. 2005) .......................................................22

*Catalyst Capital Grp., Inc. v. Silver Point Capital, L.P.*,
  No. CV044001431S, 2005 Conn. Super. LEXIS 1190
  (Super. Ct. May 4, 2005) ...................................................................51

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ...................................................16, 34

*Chovanes v. Thoroughbred Racing Ass'n*,
  No. CIV. A. 99-185, 2001 U.S. Dist. LEXIS 375
  (E.D. Pa. Jan. 18, 2001) ...................................................................47

*Cohen v. Cowles Media Co.*,
  501 U.S. 663 (1991).......................................................................38, 39

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  406 F. Supp. 3d 1258 (M.D. Ala. 2019) ...........................................4

*Council on American-Islamic Relations Action Network, Inc. v.
  Gaubatz*, 793 F. Supp. 2d 311 (D.D.C. 2011) .............................26, 27

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
  429 Md. 387 (2012) ..........................................................................54

*Creed Taylor, Inc. v. CBS, Inc.*,
  718 F. Supp. 1171 (S.D.N.Y. 1989) .................................................47

*Ctr. for Immigration Studies v. Cohen*,
  410 F. Supp. 3d 183 (D.D.C. 2019)..............................................4, 48

*Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*,
  758 F. Supp. 2d 153 (E.D.N.Y. 2010) ..............................................46

*Desnick v. ABC*,
  44 F.3d 1345 (7th Cir. 1995) ............................................................38

*DNC v. Russian Federation*,
  392 F. Supp. 3d 410 (S.D.N.Y. 2019) .........................................22, 23

*Flamm v. Am. Ass'n of Univ. Women*,
  201 F.3d 144 (2d Cir. 2000) .............................................................34

*Flip Mortg. Corp. v. McElhone*,
  841 F.2d 531 (4th Cir. 1988) ............................................................48

*Florida Star v. B.J.F.*,
  491 U.S. 524 (1989)........................................................................20

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
  194 F.3d 505 (4th Cir. 1999) ...............................................13, 37

*Foretich v. Advance Magazine Publishers, Inc.*,
  765 F. Supp. 1099 (D.D.C. 1991)...................................................38

*Fulani v. Brady*,
  935 F.2d 1324 (D.C. Cir. 1991).....................................................19

*Fulani v. League of Women Voters Educ. Fund*,
  882 F.2d 621 (2d Cir. 1989) ..........................................................19

*Gentile v. State Bar of Nevada*,
  501 U.S. 1030 (1991).......................................................................29

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)...............................................................40, 41

*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
  398 U.S. 6 (1970).............................................................14, 32

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989).............................................................49, 50

*Hourani v. Mirtchev*,
  796 F.3d 1 (D.C. Cir. 2015).............................................................45

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988).............................................................13, 37

*Int'l Data Bank v. Zepkin*,
  812 F.2d 149 (4th Cir. 1987) ..........................................................48

*Jean v. Mass. State Police*,
  492 F.3d 24 (1st Cir. 2007)..............................................................21

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
  856 F.3d 106 (D.C. Cir. 2017)........................................................15

*Kimberlin v. Nat'l Bloggers Club*,
  No. GJH-13-3059, 2015 U.S. Dist. LEXIS 32528
  (D. Md. Mar. 17, 2015) .................................................................46

*Kimm v. Chang Hoon Lee*,
  No. 04 Civ. 5724 (HB), 2005 U.S. Dist. LEXIS 727
  (S.D.N.Y. Jan. 13, 2005) ...............................................................47

*Landmark Commc'ns, Inc. v. Virginia*,
  435 U.S. 829 (1978) .......................................................................20

*Lathrop v. Juneau & Assocs., Inc.*,
  No. 03-CV-0194-DRH, 2005 U.S. Dist. LEXIS 40950
  (S.D. Ill. Apr. 25, 2005) ................................................................46

*Liberty Univ., Inc. v. Lew*,
  733 F.3d 72 (4th Cir. 2013) ...........................................................16

*Manax v. McNamara*,
  660 F. Supp. 657 (W.D. Tex. 1987) ...............................................47

*Mansmann v. Smith*,
  No. CIV. A. 96-5768, 1997 U.S. Dist LEXIS 3411
  (E.D. Pa. Mar. 21, 1997) ...............................................................47

*Marks v. City of Seattle*,
  No. C03-1701, 2003 U.S. Dist. LEXIS 22426
  (W.D. Wash. Oct. 16, 2003) ..........................................................46

*Mayfield v. NASCAR, Inc.*,
  674 F.3d 369 (4th Cir. 2012) ..................................................14, 27

*McGlotten v. Connally*,
  338 F. Supp. 448 (D.D.C. 1972) ....................................................18

*Michalak v. Edwards*,
  124 F.3d 198, 1997 U.S. App. LEXIS 23928
  (6th Cir. Sept. 9, 1997) ..................................................................45

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ....................................................14, 32, 33, 41

*Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. & Rest. Emps. Union*, 215 F.3d 923 (9th Cir. 2000) ........................................................45

*Nat'l Alliance v. United States*,
710 F.2d 868 (D.C. Cir. 1983) ..............................................................4

*New York Times Co. v. United States*,
403 U.S. 713 (1971) ............................................................................20

*O'Donnell v. CBS, Inc.*,
782 F.2d 1414 (7th Cir. 1986) ............................................................22

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264 (1974) ................................................................32

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ..............................................................33

*Peroutka v. Streng*,
695 A.2d 1287 (Md. Ct. Spec. App. 1997) ........................................36

*Philips v. Pitt County Mem'l Hosp.*,
572 F.3d 176 (4th Cir. 2009) ................................................................3

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
214 F. Supp. 3d 808 (N.D. Cal. 2016)..........................................52, 53

*Republic of Kazakhstan v. Does 1-100*,
No. 15 Civ. 1900 (ER), 2015 U.S. Dist. LEXIS 145848
(S.D.N.Y. Oct. 27, 2015) ....................................................................23

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991) ..............................................................24

*Ritchie v. Sempra Energy*,
No. 10-cv-1513-CAB (KSC), 2013 U.S. Dist. LEXIS 195688
(S.D. Cal. Oct. 15, 2013) ....................................................................46

*Rosenblatt v. Baer*,
383 U.S. 75 (1966)..............................................................................30

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)............................................................................42

*Segarra v. Messina*,
  153 F.R.D. 22 (N.D.N.Y. 1994) ........................................................47

*Smith v. Daily Mail Publ'g Co.*,
  443 U.S. 97 (1979) ...........................................................................20

*Snyder v. Phelps*,
  580 F.3d 206 (4th Cir. 2009) ...........................................................28

*Southridge Capital Mgmt., LLC v. Lowry*,
  188 F. Supp. 2d 388 (S.D.N.Y. 2002) ..............................................52

*Toston v. Thurmer*,
  689 F.3d 828 (7th Cir. 2012) .............................................................4

*Unelko Corp. v. Rooney*,
  912 F.2d 1049 (9th Cir. 1990) .........................................................38

*United States v. Ferriero*,
  866 F.3d 107 (3d Cir. 2017) ............................................................44

*United States v. Morison*,
  844 F.2d 1057 (4th Cir. 1988) .........................................................25

*United States v. Pinson*,
  860 F.3d 152 (4th Cir. 2017) ...........................................................42

*United States v. Ross*,
  476 F.3d 719 (9th Cir. 2007) .............................................................3

*Va. Citizens Def. League v. Couric*,
  910 F.3d 780 (4th Cir. 2018) .....................................................14, 15

*Ventura v. Kyle*,
  825 F.3d 876 (8th Cir. 2016) ...........................................................42

*In re Vericker*,
  446 F.2d 244 (2d Cir. 1971) ............................................................44

*Wegner v. Wells Fargo Bank Nat'l Ass'n*,
  No. 2:17-cv-1429 JCM (PAL), 2018 U.S. Dist. LEXIS 105412
  (D. Nev. June 25, 2018) ...................................................................46

*White v. Fraternal Order of Police*,
909 F.2d 512 (D.C. Cir. 1990).............................................................35

*Zerilli v. Evening News Ass'n*,
628 F.2d 217 (D.C. Cir. 1980).............................................................22

*Zimmerman v. Cambridge Credit Counseling Corp.*,
409 F.3d 473 (1st Cir. 2005).............................................................18

**Statutes**

18 U.S.C. § 201 ...................................................................................44

18 U.S.C. § 1961 .................................................................................43

18 U.S.C. § 1962 .................................................................................14

26 U.S.C. § 7428 ...........................................................................13, 17

28 U.S.C. § 2201 ...........................................................................13, 16

**Other Authorities**

2 Lee Levine et al., Newsgathering and the Law § 15.04[5]
(5th ed. Matthew Bender & Co. 2018) ...............................................21

2 Robert D. Sack, Sack on Defamation § 16.2.1 (5th ed. 2017) ............................15

x

## <u>COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.      Did the District Court correctly dismiss Allen's claim under the Declaratory Judgment Act as barred by the plain language of that statute?

2.      Did the District Court correctly dismiss Allen's tort and RICO Act claims arising from the receipt of information about a matter of public concern as protected by the First Amendment?

3.      Did the District Court correctly dismiss Allen's tort and RICO Act claims arising from challenged speech as protected by the First Amendment?

4.      Did the District Court correctly dismiss Allen's RICO Act claims on the further grounds that Allen failed plausibly to plead that defendants-appellees committed any predicate acts or engaged in a pattern of racketeering activity?

5.      Did the District Court correctly dismiss Allen's contractual claims because he was not a party to or intended beneficiary of that alleged contract?

## **PRELIMINARY STATEMENT**

This appeal involves an attempt to punish a non-profit organization that reports on extremism and hate in America simply for receiving and publishing concededly accurate information of public concern.

Although set forth in a sprawling 197-paragraph, 81-page, and nine-count Complaint, Plaintiff-Appellant Glen K. Allen's grievance against Defendants-Appellees the Southern Poverty Law Center ("SPLC") and two of its former employees fundamentally alleges three discrete acts relating to him. First, in May 2015, SPLC received from a whistleblower certain business records from a prominent neo-Nazi organization. Those records informed an investigative report about the group that is not at issue in this case. Second, in August 2016, SPLC published a news report accurately disclosing, based on the business records, that Allen—then an attorney working for the City of Baltimore and in particular defending it from a wrongful conviction claim—had long-standing ties to the neo-Nazi organization and raised questions about his hiring at a time when the City faced criticism for its approach to civil rights. Third, in 2017, SPLC published a flyer in which it referenced Allen's termination.

The District Court properly rejected each of Allen's claims as barred by federal statute, the First Amendment, or common law. Its order dismissing the Complaint with prejudice should be affirmed.

2

## COUNTERSTATEMENT OF THE CASE[1]

### I.    THE PARTIES

Allen is a Baltimore lawyer who took a contract job with the City of Baltimore as Assistant City Solicitor in February 2016 following his retirement from a private law firm.  J.A.27 ¶ 45, J.A.31-32 ¶¶ 51-52.  In this government role, Allen defended the Baltimore Police Department in a wrongful conviction and imprisonment lawsuit brought by a black man who spent 19 years in prison. J.A.33 ¶ 53.  After an SPLC news report in August 2016 disclosed his ties to a white supremacist organization, the city investigated and terminated Allen's employment.  J.A.53 ¶ 96; *see also, e.g.*, David Collins, *Baltimore fires city lawyer with neo-Nazi ties; Glen Allen says he had 'pretty awful experiences with black people,'* WBAL-TV (Aug. 18, 2016), https://www.wbaltv.com/article/baltimore-fires-city-lawyer-with-neo-nazi-ties-1/7102372.

Allen does not deny his long-time affiliation with the National Alliance, which courts have described as "a neo-Nazi/white supremacist organization that advocates race hatred, anti-Semitism, and the overthrow of the United States government."  *United States v. Ross*, 476 F.3d 719, 720 (9th Cir. 2007); *see also*

---

[1] In reviewing a Rule 12(b)(6) dismissal, the Court may "properly take judicial notice of matters of public record," as well as considering "documents attached to the complaint" and those "attached to the motion to dismiss, so long as they are integral to the complaint and authentic."  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

*National Alliance v. United States*, 710 F.2d 868, 873 (D.C. Cir. 1983) (affirming

denial of tax-exempt status where "National Alliance repetitively appeals for

action, including violence, to put to disadvantage or to injure persons who are

members of named racial, religious, or ethnic groups").  Nor does he deny his

2015-16 role in forming the American Eagle Party, J.A.31 ¶ 50, whose founder

has, *inter alia*, blamed Israel for the September 11, 2001 terrorist attacks, J.A.52.[2]

        The Montgomery, Alabama-based SPLC is a non-profit organization whose

mission is fighting hate and bigotry and seeking justice for the most vulnerable

members of society.  *See What We Do*, SPLC, https://www.splcenter.org/what-we-

do.  In furtherance of that purpose, SPLC monitors the activities of hate groups and

their leadership.  J.A.12 ¶ 16; *see also, e.g.*, *Toston v. Thurmer*, 689 F.3d 828, 831

(7th Cir. 2012) (citing testimony that "[i]n the United States, [the] two main

organizations that monitor intolerance and hate groups are the Anti-Defamation

League (ADL) and the Southern Poverty Law Center (SPLC)") (citation omitted);

*Ctr. for Immigration Studies v. Cohen*, 410 F. Supp. 3d 183, 186 (D.D.C. 2019)

("[SPLC] monitors and publishes investigative reports and expert analyses of

groups that it identifies as extremist 'hate groups.'"); *Coral Ridge Ministries

Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1269 (M.D. Ala. 2019)

---

        [2] Allen acknowledges the group is "anti-Zionist."  *E.g.*, Tom Jackman,
*Baltimore terminates contract with government lawyer accused of past neo-Nazi
ties*, Washington Post (Aug. 19, 2016), *available at* http://tinyurl.com/y3k63mzp.

("SPLC is a nonprofit organization that, among a range of activities, disseminates a 'Hate Map' that lists groups that it designates as 'hate groups'").

At the relevant time, Defendant-Appellee Heidi Beirich headed the SPLC's Intelligence Project, J.A.8 ¶ 3, which publishes reports on organizations and individuals that the SPLC believes may be—or are—hate groups or extremists, *see generally Fighting Hate*, SPLC, https://www.splcenter.org/fighting-hate.  Beirich wrote two news reports at issue in this appeal.  J.A.37 ¶ 71, J.A.42 ¶ 76. Defendant-Appellee Mark Potok is a former SPLC employee.  J.A.8 ¶ 4.

## II.    THE NEWSGATHERING AT ISSUE

According to the Complaint, the National Alliance in December 2014 "was in financial and organizational disarray" and hired an accountant named Randolph Dilloway to review the group's financial records.  J.A.34 ¶ 55.  However, the relationship between the National Alliance's chairman and Dilloway "was marked by accelerating discord," *id.* ¶ 57, that "reached a boiling point on May 3, 2015," J.A.35 ¶ 58.  At that time, the allegedly "ineffective and insubordinate" accountant became "aggressive and belligerent" with National Alliance leadership and called police, who supervised his departure from the group's property.  J.A.34 ¶ 57, J.A.35 ¶ 58.[3]  Dilloway took with him USB thumb drives with electronic copies of

---

[3] SPLC characterized this dispute differently.  According to its published article, Dilloway discovered a "prosecutable pattern of embezzlement and income tax fraud going back at least 15 years."  J.A.91-92.  After an altercation with armed

National Alliance records—confidential and stolen materials, according to Allen. J.A.35 ¶ 59.

Following Dilloway's break with the National Alliance on May 3, 2015, he contacted SPLC on May 6, 2015 and turned over copies of the "Dilloway Stolen Documents," according to the Complaint.  *See* J.A.35-36 ¶ 60.  The Complaint further alleges, "[o]n information and belief," that SPLC paid Dilloway in excess of $5,000 for the records.  J.A.36 ¶ 62.

## III.   THE RELEVANT SPLC PUBLICATIONS

### A.      "Chaos at the Compound"

On May 20, 2015, SPLC published a lengthy news report based on the business records provided by Dilloway, under the headline: "Chaos at the Compound: Allegations of Embezzlement, Money Laundering and Tax Fraud Haunt the New Chairman of the National Alliance."  J.A.35-36 ¶ 60; J.A.91-109 ("Chaos at the Compound").  SPLC has long considered the National Alliance a neo-Nazi hate group and followed its activities.  *See National Alliance*, SPLC, https://www.splcenter.org/fighting-hate/extremist-files/group/national-alliance ("The National Alliance (NA) was for decades the most dangerous and best organized neo-Nazi formation in America.  Explicitly genocidal in its ideology,

---

National Alliance leadership over his findings, and fearing for his safety, Dilloway fled the organization with copies of certain financial records and became a whistleblower to law enforcement authorities and SPLC.  *Id.*  The difference in characterization is immaterial to the legal issues on appeal.

NA materials call for the eradication of the Jews and other races and the creation of an all-white homeland.").

Chaos at the Compound mentioned Allen only once, in its forty-seventh paragraph, noting that its then-chairman "ultimately blamed longtime National Alliance lawyer Glen Allen for siding with [the former Chairman]" in a dispute over control of the organization.  J.A.104.

## B.    The Article

SPLC published the news report at the heart of this case on August 17, 2016. J.A.111-19 (the "Article").  Based in part on the National Alliance business records provided the previous year to SPLC, the Article exposed links between Allen— then a lawyer with the City of Baltimore—and the white supremacist group.  The Article opens by questioning why a man with longstanding ties to a neo-Nazi organization was defending Baltimore in a civil rights claim brought by an African-American man allegedly convicted based on false evidence by police:

> Baltimore is at the epicenter of the national debate over police violence, particularly after last week's release of a Justice Department report documenting deep racial disparities in policing in the city. That makes it particularly surprising, if not bizarre, to find a well-known neo-Nazi lawyer serving in the city's Law Department and defending the Baltimore Police Department.

> Attorney Glen Keith Allen, 65, however, has a long history of supporting one of the most notorious hate groups in America, the neo-Nazi National Alliance (NA).

> The NA was founded by William Pierce, who wrote the novel that served as the blueprint for the 1995 Oklahoma City bombing. Allen is a longtime donor and member of the NA, and public documents identify him as such. Even so, he was recently hired as an employee by the Baltimore City Law Department and is now defending the city in a lawsuit alleging that police officers withheld and fabricated evidence to wrongfully arrest and convict an African-American man for a murder it appears he did not commit.

J.A.111.  The Article then describes Allen's ties to the National Alliance, including by showing images of several business records:  Allen "was a dues-paying member of the National Alliance for years" and "was also a subscriber to the NA's racist publications, purchased entrance to a Holocaust denial conference the group held and bought a Holocaust denial DVD the group sold."  J.A.113-14.  The Article also notes multiple instances where the National Alliance referred to Allen as the organization's attorney.  J.A.115.

The Article further reports, among other things, that public records show Allen also "made political contributions to a racist political party, the American Eagle Party (AEP) National Committee," run by a man who claimed that the September 11, 2001 terrorist attacks were the work of Israel, and that "Allen also appears to be an officer in the AEP."  J.A.114-15.  The Article closes where it began, by raising questions:

> Allen may well be a skillful attorney. But at a time when Baltimore and its police department are facing devastating criticism over their policing practices, and a crisis over their

> treatment of minority residents, the hiring of a known neo-Nazi
> to litigate for them surely raises questions.

J.A.116.

### C.     The Hate Map and Hate Map Flyer

Since 1990, SPLC has published an annual census of hate groups operating

within the United States.  This "hate map" is the result of monitoring by analysts

and researchers.  *See Hate Map*, SPLC, https://www.splcenter.org/hate-map.

SPLC defines hate groups as organizations that "have beliefs or practices that

attack or malign an entire class of people, typically for their immutable

characteristics."  *Id.*

In 2017, SPLC also produced a two-page flyer that contained a smaller

version of the 2016 hate map and additional information about SPLC's work.

J.A.60-61 ¶ 113; *see also* J.A.121-22 ("Hate Map Flyer").  The first page of the

document showed SPLC's map of the United States, identifying the location of

designated hate groups by various categories (Black Separatist, Ku Klux Klan,

Anti-Muslim, White Nationalist, Neo-Nazi, Racist Skinhead, Anti-LGBT, Neo-

Confederate, Christian Identity, and General).  J.A.121.  The second page

summarized "SPLC's Hard-Hitting, Three-Point Strategy to Combat Hate Crimes

& Extremists."  J.A.122.  This included (1) "seeking justice," through public-

interest litigation; (2) "teaching tolerance," through the distribution of educational

materials; and (3) "fighting hate," by tracking and exposing hate groups. One of

the examples in the third category—"fighting hate"—referenced Allen:

> **EXPOSING RACISTS WHO INFILTRATE PUBLIC INSTITUTIONS**
>
> Hate group members and followers of their ideologies sometimes manage to obtain important positions of power. When the city of Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew of his involvement with white supremacist groups, except for us. Because of our investigation and expose, he was swiftly fired.

*Id.*; *see also* J.A.60-61 ¶ 113. A small photograph of Allen accompanied the item.

J.A.122.

## IV.   ALLEN'S COMPLAINT

Allen filed the Complaint in this case on December 8, 2018. J.A.5.

Although any defamation claim based on the Article is time-barred under

Maryland's one-year statute of limitations, the Article underlies all of Allen's

allegations of harm. J.A.42 ¶ 76 (alleging that the 2016 Article "caused Allen to

lose his position as an attorney at the Baltimore City Law Department, destroyed

his future prospects of employment as an attorney, and ravaged his reputation as a

competent and ethical attorney.").[4]

---

[4] Although he does not base a defamation claim on the Article, Allen disputes that he was fairly characterized as a "well known" neo-Nazi, J.A.45-46 ¶¶ 82-84; or that AEP was "racist" because "there were no racial elements in the AEP's platform or membership criteria," J.A.48-49 ¶¶ 89-90. He also urges that the Article was "one-sided" because it did not reference his *pro bono* work. J.A.49-52

Allen premises his claims on (1) SPLC's receipt of National Alliance business records from Dilloway, which he alleges violated the law in numerous ways, J.A.36-37 ¶¶ 61-70; (2) his SPLC-"orchestrated" firing after the Article accurately disclosed his ties to the National Alliance, J.A.42 ¶ 76; and (3) SPLC's use of the verb "infiltrate" in the Hate Map Flyer, J.A.82-84 ¶¶ 183-91. Based on these predicates—receiving information from a whistleblower and publishing an accurate news report and a later characterization of it—the Complaint purports to state nine causes of action. It seeks a declaratory judgment against SPLC's nonprofit status, J.A.65-71 ¶¶ 121-32, and asserts civil claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, J.A.71-77 ¶¶ 133-58, as well as for tortious interference with prospective advantage and with contract, J.A.77-79 ¶¶ 159-71, negligent training and supervision, J.A.79-81 ¶¶ 172-77, restitution, J.A.81-82 ¶¶ 178-82, and aiding and abetting a breach of contract, J.A.84-85 ¶¶ 192-97, in addition to a defamation claim arising from the Hate Map Flyer.

## V.    THE LITIGATION BELOW

SPLC and Beirich moved to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim for

---

¶¶ 92-94 (alleging Article "omit[ed] any facts suggesting that Allen, although a fallible human being who has made mistakes, has redeemable qualities").

which relief can be granted.  J.A.3 (Dkt. 9).[5]  The District Court (Blake, J.) granted the motion on November 13, 2019.  J.A.4 (Dkt. 25).

In a memorandum opinion, the District Court first rejected the challenge to SPLC's tax status, finding improper venue under the federal Declaratory Judgment Act.  J.A.174.  The District Court then considered Allen's tort claims, recognizing that all of these claims seek to redress alleged harm to reputation arising from publications, and therefore must meet First Amendment standards.  J.A.176.  Finding that Allen failed to dispute the truth of factual statements and that the remaining statements were non-actionable opinion or hyperbole, the District Court found them barred by the First Amendment.  J.A.176-80.  To the extent that Allen's claims arose from the receipt of the Dilloway documents, the District Court found liability foreclosed as a matter of law under *Bartnicki v. Vopper*, which held that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern."  532 U.S. 514, 535 (2001).

The District Court found the same analysis applicable to the RICO claims, and thus that Allen failed to plead a viable RICO claim.  J.A.178-83.  Turning finally to the contract claims, the District Court found that the Complaint failed to plead facts plausibly alleging that Allen was a third-party beneficiary of any

---

[5] Potok filed a motion to dismiss for lack of personal jurisdiction that was denied, but in the alternative joined SPLC's motion.  J.A.3 (Dkt. 10).  The District Court's merits ruling applied to all defendants-appellees.  J.A.186.

agreement between the National Alliance and Dilloway with which SPLC

allegedly interfered.  J.A.183-84.  This appeal followed.

### SUMMARY OF ARGUMENT

1.     Allen's Declaratory Judgment Act claim, which seeks a determination

that SPLC violated the conditions of its Section 501(c)(3) tax-exempt status, fails

because the Act specifically prohibits declaratory judgments "with respect to

Federal taxes" except in circumstances that, as the District Court correctly

recognized, are not present here.  28 U.S.C. § 2201(a); 26 U.S.C. § 7428(a).

2.     Allen's tort and RICO Act claims, to the extent they arise from

SPLC's newsgathering activity, fail as a matter of law because the Complaint

alleges that Dilloway provided business records to SPLC only *after* taking them

from the National Alliance, and not any facts plausibly establishing that SPLC

itself was involved in the alleged theft of the records.  The First Amendment

protects the receipt of information of public concern, even if a source violated the

law in obtaining that information.  *Bartnicki*, 532 U.S. at 535.

3.     The District Court correctly dismissed Allen's tort and RICO Act

claims, to the extent they arise from SPLC's publications, because the First

Amendment applies to all claims for reputational harm, however styled.  *Hustler

Magazine, Inc. v. Falwell*, 485 U.S. 46, 51-57 (1988); *Food Lion, Inc. v. Capital

Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999).  Here, the challenged speech

is either not alleged to be substantially false or represents opinion or rhetorical hyperbole. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16-20 (1990); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970). As such, it is non-actionable as a matter of law.

4.      Allen's RICO Act claims fail on the further and additional grounds that Allen did not plead facts plausibly establishing that SPLC and its two former employees committed any predicate acts or that they engaged in a pattern of racketeering activity. 18 U.S.C. §§ 1962(c) & (d).

5.      Even if they did not seek reputational damages foreclosed by the First Amendment, which they do, Allen's contractual claims also were properly dismissed as a matter of law because the Complaint does not plead facts plausibly establishing that he was a party to or intended beneficiary of an alleged contract between the National Alliance and Dilloway.

## **ARGUMENT**

This Court "review[s] de novo a district court's grant of a motion to dismiss." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018). To survive such a motion to dismiss, a plaintiff must set forth factual allegations that plausibly allege each element of the stated cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These factual allegations must be sufficient to "'raise a right to relief above the speculative level.'" *Mayfield v. NASCAR, Inc.*, 674 F.3d

14

369, 377 (4th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56

(2007)). As such, "[a] pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 555, 557).

Claims arising from challenged speech implicate constitutional rights, and

courts accordingly review them carefully. As the D.C. Circuit recently noted:

> The First Amendment guarantees freedom of speech and freedom of
> the press. Costly and time-consuming defamation litigation can
> threaten those essential freedoms. To preserve First Amendment
> freedoms and give reporters . . . the breathing room they need to
> pursue the truth, the Supreme Court has [therefore] directed courts to
> expeditiously weed out unmeritorious defamation suits.

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citations

omitted). Claims arising from publications are also susceptible to early judicial

action for a more practical reason: "[U]nlike in most litigation, in a libel suit the

central event—the communication about which suit has been brought—is

ordinarily before the judge at the pleading stage. He or she may assess it upon a

motion to dismiss, firsthand and in context." 2 Robert D. Sack, Sack on

Defamation § 16.2.1 (5th ed. 2017). As such, this Court has affirmed the dismissal

of such cases where, as here, they are deficient as a matter of law. *See, e.g.*,

*Couric*, 910 F.3d at 787 (affirming dismissal where challenged publication "simply

does not rise to the level of defamation" as a matter of law); *Biospherics, Inc. v.*

*Forbes, Inc.*, 151 F.3d 180, 182, 186 (4th Cir. 1998) (affirming dismissal

"[b]ecause the challenged statements are constitutionally protected"); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091-92 (4th Cir. 1993) (same).

Because First Amendment rights are clearly implicated here, and because Allen's claims fail as a matter of law, this Court should affirm the District Court's dismissal of Allen's Complaint with prejudice.

## I.    THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S DECLARATORY JUDGMENT ACT CLAIM

The Complaint seeks a declaratory judgment that SPLC has violated the requirements for federal non-profit tax status.  J.A.68.  The Declaratory Judgment Act, however, expressly forecloses such actions except in limited circumstances. The Act gives courts the power to "declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought," in "a case of actual controversy within its jurisdiction, *except* with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code."  28 U.S.C. § 2201(a) (emphasis added); *e.g.*, *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 87 n.4 (4th Cir. 2013) ("The Declaratory Judgment Act authorizes federal courts to issue declaratory judgments, except 'with respect to Federal taxes.'" (citing 28 U.S.C. § 2201(a)).

As such, Allen's claim seeking a tax-related declaratory ruling is limited to those permissible under Section 7428.  That provision governs "a determination by the Secretary with respect to the initial qualification or continuing qualification of

16

an organization as an organization described in section 501(c)(3) which is exempt from tax under 501(a)." 26 U.S.C. § 7428(a)(1). However, it places requirements on such challenges, including a specific venue: It authorizes only "the United States Tax Court, the United States Court of Federal Claims, or the district court of the United States for the District of Columbia" to make a declaration with respect to such initial qualification or continuing qualification. *Id.* § 7428(a)(2). As a result, the District Court properly dismissed Allen's claim because the U.S. District Court for the District of Maryland is not a proper forum. J.A.174.

Dismissal can be affirmed on this basis alone. Section 7428, however, *further* limits such actions to those brought by the organization whose tax status is at issue, 26 U.S.C. § 7428(b)(1), and requires an exhaustion of administrative remedies "available to it *within the Internal Revenue Service*," *id.* § 7428(b)(2) (emphasis added). In short, Allen's claim involves both the wrong plaintiff and the wrong defendant, in addition to being brought in the wrong court, and is properly dismissed on all of these bases.

Allen seeks to escape this controlling authority by urging—remarkably— that his effort to seek a declaratory ruling on "SPLC's noncompliance with 501c3 requirements" is somehow "not directed to the collection or assessment of taxes." Opening Br. of Appellant ("Br.") at 15. This argument contradicts not only common sense but also Supreme Court precedent. In applying the Tax Injunction

Act, which Allen acknowledges is "coterminous" with the "with respect to federal taxes" language in the Declaratory Judgment Act, *id.*, the Supreme Court found no authority for courts to issue injunctions relating to continuing 501(c)(3) status. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 727 (1974). Allen's principal reliance on a 1972 district court decision, *McGlotten v. Connally*, 338 F. Supp. 448 (D.D.C. 1972), is inapposite because, as the District Court recognized, it involved a constitutional, rather than statutory, challenge. *McGlotten* involved an action to enjoin the Secretary of the Treasury from granting 501(c)(3) status to nonprofit organizations that denied membership on the basis of race. As the District Court correctly noted in rejecting it as persuasive authority here:

> Unlike *McGlotten*, this case does not involve the government's allegedly unconstitutional actions. Rather, Allen disputes only whether the IRS properly has continued to classify SPLC as a 501(c)(3) tax exempt entity, which is a tax status given for the purpose of the collection and assessment of taxes. Therefore, Allen's claim is an action 'with respect to Federal taxes' and must be brought under section 7428 of the Internal Revenue Code.

J.A.174.

Nor is this case analogous to situations where courts properly consider an organization's tax status as an ancillary question to one properly before the court. While Allen relies on *Zimmerman v. Cambridge Credit Counseling Corp.*, that decision simply acknowledges that, in certain circumstances, courts properly review an entity's 501(c)(3) status in determining *other issues*. 409 F.3d 473, 478

(1st Cir. 2005). But non-profit status is not a threshold inquiry for any other legal issue in this case—it is the *sine qua non* of the claim for a declaratory judgment regarding SPLC's 501(c)(3) status. That is barred by statute here, as the District Court correctly concluded.[6]

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT SPLC'S NEWSGATHERING ACTIVITY IS PROTECTED BY THE FIRST AMENDMENT UNDER THE *BARTNICKI* DOCTRINE

The District Court correctly rejected Allen's claims to the extent they arise from SPLC's receipt of copies of National Alliance business records from a whistleblower. J.A.178-80. The reason is simple: The Complaint does not allege that SPLC *itself* stole materials from National Alliance, or that it *commissioned* Dilloway to do so. Rather, Allen alleges that the accountant had an altercation with National Alliance leadership, took electronic copies of business records, and

---

[6] Allen also cites *Fulani v. League of Women Voters Education Fund*, 882 F.2d 621 (2d Cir. 1989). Br. at 16. That decision did not consider the Declaratory Judgment Act, but rather whether a political candidate excluded from a debate had *standing* to challenge that decision on constitutional grounds, including challenging the tax status of the sponsor. While acknowledging that "federal courts have frequently rejected attempts by litigants to challenge the tax-exempt status of third parties," 882 F.2d at 625, the *League of Women Voters* court found standing under the specific facts of that case. However, other courts have criticized the decision in light of the "'special problems,'" attendant to third-party challenges to tax-exempt status. *Fulani v. Brady*, 935 F.2d 1324, 1326-29 (D.C. Cir. 1991). Even were the Act somehow not a bar to Allen's claim here, he also clearly lacks standing. Allen has pleaded no facts plausibly establishing personal injury that is fairly traceable to SPLC's *non-profit status* analogous to being excluded from a specific debate. In addition, the absence in this action of the Treasury Department as a defendant, as it was in *League of Women Voters*, also means that any injury clearly could not be redressed by a declaration by the court.

19

then several days later provided copies of those business records to SPLC, and that by accepting the allegedly stolen information SPLC broke various laws. J.A.35-36 ¶¶ 58-62. Although these claims do not withstand scrutiny on their own merits, *see* page 44, *infra*, they are also barred by the First Amendment.

### A. Allen Misapprehends the *Daily Mail-Bartnicki* Doctrine

The Supreme Court has long recognized that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publ'g Co*., 443 U.S. 97, 102 (1979). In the *Daily Mail* case, journalists engaged in "routine newspaper reporting techniques" to obtain the name of a juvenile defendant, and published the name despite a state law prohibiting such disclosure. *Id.* at 103. The conduct was constitutionally protected. *Id.*; *see also, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 526 (1989) (First Amendment precludes damages action of rape victim against a newspaper that published name in violation of a Florida statute prohibiting disclosure of victims' names); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 840-42 (1978) (First Amendment protected newspaper's right to report information about confidential judicial disciplinary proceedings that source was not legally permitted to disclose); *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam) (upholding right to publish "Pentagon Papers" documents stolen by a third party). Put another way, publishers do not act "unlawfully" simply by receiving or disseminating

20

information knowing that the news source violated the law.  Rather, information is *only* "unlawfully obtained" for First Amendment purposes where *the publishing defendant* has itself broken the law in physically obtaining the information.  *See generally* 2 Lee Levine et al., Newsgathering and the Law § 15.04[5] (5th ed. Matthew Bender & Co. 2018).

The District Court properly relied on *Bartnicki*, the latest Supreme Court decision in this line of authority, to analyze Allen's claims.  J.A.178-80.  The defendants in *Bartnicki* received a recording of a wireless telephone conversation that they knew, or should have known, had been illegally recorded and disclosed under state and federal wiretap laws.  532 U.S. at 517-18, 525.  The Court nevertheless concluded that the defendants' "access to the information on the tapes was obtained lawfully," because accepting information with knowledge of a source's illegal acts is not itself unlawful under the First Amendment.  *Id.* at 525.  Were the rule to the contrary, the law would functionally compel publishers to enforce the confidentiality and legal obligations of news sources and profoundly restrict the public's ability to discuss a range of topics.

Both before and after *Bartnicki*, therefore, courts have rejected attempts to hold publishers liable for receiving or disclosing information that, allegedly, they received from a source they knew had violated the law.  *See, e.g.*, *Jean v. Mass. State Police*, 492 F.3d 24, 32-33 (1st Cir. 2007) (First Amendment protected online

posting of illegal recording notwithstanding allegation that poster was in "active

collaboration" with known source); *Bowley v. City of Uniontown Police Dep't*, 404

F.3d 783, 787 (3d Cir. 2005) (although police source "violated Pennsylvania law

prohibiting the release of juvenile arrest records" by providing them to newspaper,

"his unlawful release of the information does not make receipt of that information

by the Herald Standard unlawful"); *O'Donnell v. CBS, Inc.*, 782 F.2d 1414, 1420

(7th Cir. 1986) (CBS's receipt of stolen documents did not constitute intrusion

where there was "no evidence in the record that CBS in any way 'induced' the

alleged intrusion into [plaintiff's] credenza" by his secretary); *Zerilli v. Evening

News Ass'n*, 628 F.2d 217, 222-24 (D.C. Cir. 1980) (no *Bivens* claim lay against a

reporter who allegedly conspired with federal officials to procure confidential

transcripts of illegal wiretaps because "holding a newspaper liable in damages for

uncovering and publishing information that it deems newsworthy" would be

inconsistent with "[t]he values served by a free and vigilant press").

A recent example of this rule lies in the publication of materials that were

illegally "hacked" by a third party. Applying the *Bartnicki* doctrine, a federal court

last year rejected an attempt by the Democratic National Committee to assert tort

and RICO claims against the Trump campaign and Wikileaks, among others, for

disclosing copies of stolen electronic files. *DNC v. Russian Federation*, 392 F.

Supp. 3d 410, 437-38 (S.D.N.Y. 2019). The dispositive issue was that "the DNC

does not allege any facts to show plausibly that any of the defendants, other than

the Russia Federation, had any role in hacking the DNC's computers or stealing its

information." *Id.* As such, the DNC failed to state a viable claim against these

defendants:

> If WikiLeaks could be held liable for publishing documents
> concerning the DNC's political financial and voter-engagement
> strategies simply because the DNC labels them "secret" and trade
> secrets, then so could any newspaper or other media outlet. But that
> would impermissibly elevate a purely private privacy interest to
> override the First Amendment interest in the publication of matters of
> the highest public concern.

*Id.* at 437; *see also Republic of Kazakhstan v. Does 1-100*, No. 15 Civ. 1900 (ER),

2015 U.S. Dist. LEXIS 145848, at *2 (S.D.N.Y. Oct. 27, 2015) (no injunction

against publisher's online posting of hacked documents because "the *Daily Mail*

rule protects the publication of the [stolen] documents by anyone other than those

directly involved in their purported theft").

Allen cites the decision in *Boehner v. McDermott*, 441 F.3d 1010, 1016-17

(D.C. Cir. 2006), for the contrary proposition that knowingly receiving stolen

information is actionable, Br. at 19. Allen acknowledges the decision was

subsequently vacated, but neglects to note that the *en banc* court *repudiated* this

very language. Writing for a majority of the court on this point, Judge Sentelle

held that "the otherwise-lawful receipt of unlawfully obtained information remains

in itself lawful, even where the receiver knows or has reason to know that the

source has obtained the information unlawfully." *Boehner v. McDermott*, 484 F.3d

573, 585 (D.C. Cir. 2007) (en banc) (Sentelle, J., dissenting).[7]  A majority further

explicitly held that newspapers that receive illegal recordings cannot

constitutionally be punished for sharing them with the public.  *Id.* at 586.  That is

precisely what the Complaint alleges that SPLC did here—receive the allegedly

stolen documents and share relevant portions with the public.

        While this Court has not applied *Bartnicki*, it has recognized the principle

that, in order for information to qualify as "unlawfully obtained," *the publishing*

*defendant*—and not just the original source—must have broken the law in

physically obtaining the information.  Thus, in rejecting an intrusion claim against

a publisher, this Court held that "assuming the facts most favorable to [plaintiff],

that a government official [] leaked the [document] in violation of government

policy, this violation does not mean the [defendant] unlawfully obtained" it.

*Reuber v. Food Chem. News, Inc*., 925 F.2d 703, 719 (4th Cir. 1991).  Another

judge expressed doubt that the press could constitutionally be prosecuted under the

Espionage Act for facilitating a leak of classified information by a government

---

        [7] Judge Griffith joined four dissenters in forming the majority on this issue.  484
F.3d at 581 ("I believe it is worth noting that a majority of the members of the
Court—those who join Part I of Judge Sentelle's dissent—would have found his
actions protected by the First Amendment." (Griffith, J., concurring)).  A different
majority held McDermott liable only because, as a member of the House Ethics
Committee, he had assumed a special duty not to disclose information provided to
the House.  *Id.*

source. *United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson, J., concurring) (noting that amici "press organizations … are not being, and probably could not be, prosecuted under the espionage statute" for source's illegal disclosure).

This case involves run-of-the mill business records of a neo-Nazi organization, including those showing transactions with a man who would go on to a government job defending the City of Baltimore in a civil rights case. They include a donation receipt (J.A.113), a "Holocaust Revisionist Conference" receipt (J.A.114), a dues payment receipt (J.A.117), a receipt for a DVD (J.A.118), and a 1987 letter (J.A.119). Because the Complaint unambiguously alleges that Dilloway took electronic copies of these records following his split with the National Alliance on May 3, 2015, and then provided them to SPLC several days later, J.A.35-36 ¶¶ 58-62, Allen cannot under *Bartnicki* maintain claims against SPLC arising from its mere receipt of this information.

## B.  Allen's Attempts to Distinguish *Bartnicki* Fail

In seeking to escape this clear legal bar to claims based on the SPLC's receipt of information, Allen offers three principal arguments. First, he analogizes this case to the inapposite circumstance where a publisher *itself* allegedly collected the information illegally. Br. at 20-27. Second, he urges that SPLC owed him legal duties under the Rules of Professional Responsibility. *Id.* at 18-19, 22-23.

Finally, he asserts incorrectly that *Bartnicki* adopted a "balancing test" and, somewhat remarkably, that ties to a neo-Nazi organization by a government official charged with defending a civil rights lawsuit by an African American man are not a matter of "public concern." *Id.* at 27-31. None of these arguments has merit.

### 1. Alleged Involvement in Theft

Allen seeks to equate the allegations made in the Complaint with those in *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, a case in which the defendants allegedly embarked on a "six-month counterintelligence operation" to plant an intern within an advocacy organization and surreptitiously make audio and video recordings. 793 F. Supp. 2d 311, 318-19 (D.D.C. 2011). Because the defendants *themselves* allegedly violated the law in collecting the recordings, the First Amendment did not presumptively shield them. *Id.* at 331-32; *see also id.* at 332 ("However, that is not to say that the First Amendment is irrelevant to this case. It may, for example, turn out that Plaintiffs will be unable to establish that some or all of the defendants in this action participated in the unlawful acquisition of information."). The key, and the element missing from the Complaint's allegations against SPLC, is actual participation in the illegal collection of the materials from the National Alliance. Indeed, in *Gaubatz* the allegedly illegal recordings were provided to and published by a third-party book

26

publisher and a third-party website—neither of which was named a defendant.  *Id.* at 318-19.  SPLC's alleged role here is akin to those publishers.[8]

Allen urges that his allegations "support far more than these minimal criteria."  Br. at 20.  But the Complaint's allegations all relate to SPLC conduct *after being contacted by Dilloway*.  *Id.* at 20-21.  Nowhere does the Complaint allege that SPLC was itself involved in any alleged theft of records from the National Alliance—as even Allen acknowledges.  *Id.* at 26 ("It is perhaps possible to construe Allen's allegations such that Dilloway and the SPLC Defendants had no contact prior to May 3, 2015.").  While Allen urges that a "plausible interpretation" of the facts is that SPLC *might* have commissioned a crime, he points to no factual allegations in the Complaint that plausibly plead such a scenario, as he must.  *Mayfield*, 674 F.3d at 377.  As such, the District Court properly concluded that "this has not plausibly been alleged," J.A.179, and therefore that this case is controlled by *Bartnicki*.  *Id.*

---

[8] The Complaint also alleges that SPLC paid Dilloway for copies of the business records.  J.A.36 ¶ 62.  Even assuming the truth of this allegation on a motion to dismiss (and, to be clear, SPLC denies it) Allen has offered no authority for the proposition that this allegation changes the legal analysis, nor is it clear why it would.  The key question for First Amendment protection for the receipt of information on matters of public concern is whether a defendant itself participated in the allegedly illegal collection of information.  Here, any alleged payment by the SPLC occurred *after* an alleged theft, which is analytically indistinguishable from other types of consideration to news sources, like promises of confidentiality, that have not troubled the Supreme Court.

27

### 2.    Alleged Special Duties

Allen next seeks to analogize SPLC to the defendant in *Boehner*, a

congressman who was a member of the House Ethics Committee, whom the court

concluded had a special duty not to disclose to a reporter an illegally obtained

recording that was relevant to an Ethics Committee matter.  484 F.3d at 575, 579.

However, the court expressly held that its ruling does *not* apply to "private citizens

who did not occupy positions of trust," like that of a congressman charged with

protecting the confidences of his committee.  *Id.* at 579.  And the Supreme Court

has routinely recognized that First Amendment protections apply equally to

citizens.  In *Bartnicki*, for example, the Court expressly noted that "we draw no

distinction between the media respondents and" a non-media respondent.  532 U.S.

at 525 & n.8; *see also, e.g.*, *Snyder v. Phelps*, 580 F.3d 206, 219 n.13 (4th Cir.

2009) ("Any effort to justify a media/nonmedia distinction rests on unstable

ground, given the difficulty of defining with precision who belongs to the

'media.'"), *aff'd*, 562 U.S. 443 (2011).

Allen halfheartedly urges that SPLC enjoys such a position of trust as a

result of its status as a public interest law firm. [9]  Br. at 22-23.  But, as the District

Court correctly held, the National Alliance business records "had nothing to do

with any duties of confidentiality the defendants may have had with respect to their

---

[9] The Complaint does not allege that either of the individual defendants, Beirich and Potok, is a lawyer.  Indeed, neither is a member of the bar.

28

*legal* work." J.A.180 (emphasis added). In any event, even in connection with their legal work lawyers enjoy First Amendment protections for their speech just like anyone else engaging in expressive conduct. *E.g.*, *Gentile v. State Bar of Nev*., 501 U.S. 1030, 1054 (1991) ("[O]ur cases recognize that disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law."). Nor is there any basis for some lesser First Amendment protection of non-profit speakers, as opposed to others. This argument is a red herring.

### 3.     A Supposed Balancing Test

Finally, Allen relies on the concurrence in *Bartnicki* to assert, incorrectly, that the majority adopted a "balancing test that assigns weight to the competing fundamental interests involved," Br. at 27, and then compounds the error by arguing that the affiliations of a public official are a matter of private concern such that *Bartnicki*'s protections should not apply here, *id.* at 30-31. He errs on both points.

Justice Stevens delivered the opinion of the *Bartnicki* court, writing for six justices. The majority opinion described the privacy interests in the wiretapped communications—one of the interests claimed as sufficient to justify liability—as "important." 532 U.S. at 532. Nevertheless, the Court determined that this interest

categorically gives way to "the interest in publishing matters of public importance." *Id.* at 534. Thus, while a wiretapped debate over high school teacher compensation in *Bartnicki* was "mundane," the court found its dissemination by a third party "no less worthy of constitutional protection." *Id.* at 535. The inquiry thus devolves to the single question of whether the information at issue was of public concern. Clearly, the fact that an attorney for the City of Baltimore had ties to a neo-Nazi organization meets that test. *See, e.g.*, *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966) (noting "the general public interest in the qualifications and performance of all government employees").

Thus, Allen's attempts to distinguish (or outright diminish) *Bartnicki* each fall apart under scrutiny. The District Court concluded correctly that, under *Bartnicki*, the First Amendment fully protects SPLC's newsgathering activity.

## III. THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S TORT CLAIMS BECAUSE THEY CHALLENGE SPEECH THAT IS PROTECTED BY THE FIRST AMENDMENT

Allen's Complaint asserts tort claims for defamation, tortious interference with prospective advantage (*i.e.*, Allen's contract with the City of Baltimore), negligent training and supervision, and unjust enrichment. The District Court correctly concluded these claims fail under the First Amendment.

## A.    Allen Fails to State a Claim for Defamation

Because any defamation claim arising out of the Article is time-barred in

Maryland, Allen's defamation claim focuses exclusively on the Hate Map Flyer.

J.A.82-84 ¶¶ 184-91.  The relevant portion of the Flyer stated:

**EXPOSING RACISTS WHO INFILTRATE PUBLIC
INSTITUTIONS**

> Hate group members and followers of their ideologies sometime
> manage to obtain important positions of power.  When the city of
> Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew
> of his involvement with white supremacist groups, except for us.
> Because of our investigation and expose, he was swiftly fired.

J.A.122.  Allen asserts that "[t]he defamation here did not rest on whether or not

[he] was or is a 'neo-Nazi' or a 'racist,'" and in fact he dismisses those labels as

"irrelevant to this litigation."  Br. at 38.  Allen also does not deny "his involvement

with white supremacist groups"—nor could he given that he does not dispute the

authenticity of the National Alliance documents upon which SPLC based its

reporting.  *See* J.A.42-43 ¶ 78.  Rather, Allen argues that merely by using the word

"infiltrated," the Flyer conveys the allegedly false implications that (1) he

"abused" his position with the Law Department; and (2) he "behaved unethically"

in that same position.  Br. at 39-40.

The Constitution protects this challenged speech and prevents Allen from

stating a libel claim as a matter of law for at least three reasons, each of which

separately and independently justified dismissal.  First, "infiltrated" is a clear

example of "rhetorical hyperbole" that cannot amount to actionable defamation. Second, Allen's claim is actually one of libel-by-implication, and he cannot satisfy this Circuit's rigorous two-part standard for asserting such claims. Third, even if the Hate Map Flyer did reasonably convey the allegedly false implications that Allen suggests—and it does not—those implications would nevertheless be protected by the First Amendment as conclusions or expressions of opinion based on fully disclosed true facts.

### 1. The text at issue is a non-actionable use of rhetorical hyperbole.

Recognizing the "constitutional limits on the type of speech which may be the subject of state defamation actions," *Milkovich*, 497 U.S. at 16-20 (emphasis omitted), the Supreme Court has held that "rhetorical hyperbole" cannot give rise to a viable defamation claim. On this basis, the Court has shielded from liability the description of a real estate developer as engaging in "blackmail," which the Court called "a vigorous epithet," and the characterization of workers crossing a picket line as "traitors," which the Court deemed "a lusty and imaginative expression of . . . contempt," even though in both cases plaintiffs argued that those statements accused them of criminal conduct. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 286 (1974); *Bresler*, 398 U.S. at 14. By protecting this type of rhetorical hyperbole, the First Amendment

"provides assurance that public debate will not suffer for lack of 'imaginative expression.'" *Milkovich*, 497 U.S. at 20.

Here, as the District Court correctly recognized, the word "infiltrated" is non-actionable "rhetorical hyperbole" because it "is loose, figurative, or hyperbolic language, which in this context no reasonable reader would take to assert actual facts." J.A.178 (internal marks omitted). Allen's response on appeal is to assert that, simply because it is a "law firm," SPLC somehow is precluded from engaging in rhetorical hyperbole. Br. at 42. Setting aside that courts have in fact protected statements made by attorneys as "rhetorical hyperbole," *see, e.g.*, *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995), this particular statement must be read in the context of the publication as a whole, *Batson v. Shiflett*, 325 Md. 684, 723 (1992) ("[W]ords have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed.").

As the Court can see for itself, the word "infiltrated" here comes in the context of a two-page flyer titled "White Supremacists Celebrate Trump's Victory: SPLC Documented More Than 1,000 Hate Incidents After the Election," under the heading "The SPLC's Hard-Hitting, Three-Point Strategy To Combat Hate Crimes & Extremists." J.A.121-22. This is precisely the sort of context in which a reasonable reader would *expect* to see loose, figurative language, as is clear from

the other items on the same page.  J.A.122 ("Crushing Border Vigilantes"; "Taking

Down The Imperial Klans Of America"; "Making The Klan Pay In South

Carolina").  Allen's apples-and-oranges attempt to equate this Flyer to the "fact-

laden" and "straightforward directory of attorneys and other professionals" at issue

in *Flamm v. American Association of University Women*, 201 F.3d 144 (2d Cir.

2000), serves only to illustrate why, in context, the term "infiltrated" constitutes

rhetorical hyperbole that *cannot* give rise to a libel claim.

### 2.    Allen cannot pass the rigorous test for libel-by-implication claims.

Allen claims that, although the Hate Map flyer does not contain any explicit

statements about his ethics or competence as a lawyer, it nevertheless conveys the

allegedly false *implication* that he behaved unethically or abused his power at the

City Law Department.  This Court has recognized, however, that a plaintiff in

Allen's position must make an "especially rigorous showing" to state such a claim

for defamation by implication given the Constitution's protection for truthful

speech.  *Chapin*, 993 F.2d at 1092-93.  To qualify as an actionable statement, the

challenged language itself must **(1)** "be reasonably read to impart the false

innuendo" and **(2)** "affirmatively suggest that the author intends or endorses the

inference."  *Id.* at 1093.  This two-prong test ensures that courts will "be vigilant

not to allow an implied defamatory meaning to be manufactured from words not

reasonably capable of sustaining such meaning." *White v. Fraternal Order of Police*, 909 F.2d 512, 518-19 (D.C. Cir. 1990).

Allen has not and cannot make this threshold showing. Nothing in SPLC's reporting on Allen *reasonably* implies or suggests an *intent* to imply that he is incompetent or unethical. To the contrary, SPLC affirmatively acknowledged that "Allen may well be a skillful attorney." J.A.116. SPLC also did not suggest that Allen's racist affiliations conflicted with effectively representing the City, but rather that they were troublingly aligned with the City's own history of aggressively defending allegedly racist police practices. *Id.* As the Article concluded, "at a time when Baltimore and its police department are facing devastating criticism over their policing practices, and a crisis over their treatment of minority residents, the hiring of a known neo-Nazi to litigate for them surely raises questions." *Id.* Those questions were about Baltimore's attitude toward minorities, *not* plaintiff's professional skills. Thus, the concise and truthful statements in the Hate Map Flyer, like the Article, are not capable of sustaining the defamatory implications plaintiff alleges under the two-prong *Chapin* test.

### 3. Any implication here is an opinion based on disclosed facts.

Finally, *even if* the Hate Map Flyer did convey the reasonable implication that Allen behaved improperly by acting as an attorney for the City of Baltimore despite his long-standing ties to and support for a white supremacist organization,

35

that implication would be non-actionable under Maryland law and the First

Amendment.  As this Court has recognized, where a challenged publication

"disclose[s] the factual bases" for an opinion or conclusion and those factual bases

are concededly accurate, any defamation claim arising out of the opinion or

conclusion is "doom[ed]" as a matter of law.  *Biospherics*, 151 F.3d at 185;

*Peroutka v. Streng*, 695 A.2d 1287, 1299 (Md. Ct. Spec. App. 1997) ("[W]hen the

facts for the bases of the opinion are given and the underlying facts are true . . . ,

the defendant is not subject to liability.").

    Here, the factual basis for the Hate Map Flyer's characterization of Allen—

that he obtained a senior job with the City in spite of his affiliations with white

supremacists—is undisputed and was disclosed in the Flyer itself.  J.A.121-22.

The First Amendment thus protects any unstated implication arising out of those

disclosed true facts, because "[i]f the Constitution protects an author's right to

draw an explicit conclusion from fully disclosed facts, then an unstated inference

that may arise in a reader's mind after reading such facts is also protected as an

implicit expression of the author's opinion."  *Biro v. Condé Nast*, 883 F. Supp. 2d

441, 468 (S.D.N.Y. 2012), *aff'd on other grounds*, 807 F.3d 541 (2d Cir. 2015).

## B.    Allen Cannot Make An "End Run" Around The First Amendment Merely By Asserting Tag-Along Tort Claims

    Allen attempts to evade this clear constitutional bar to his defamation claim

by pleading functionally identical claims for tortious interference with prospective

advantage, negligent training and supervision, and unjust enrichment. As the
Supreme Court and this Court have held, however, such causes of action seeking
damages for injuries allegedly arising from the content of a publication—no matter
how they may be styled by plaintiffs seeking to avoid constitutional limits—are
subject to all of the First Amendment and other defenses governing libel claims.

Perhaps the clearest expression of this principle can be found in *Food Lion,
Inc. v. Capital Cities/ABC, Inc.*, where this Court expressly held that plaintiffs
cannot "recover defamation-type damages under non-reputational tort claims,
without satisfying the stricter (First Amendment) standards of a defamation claim."
194 F.3d at 522. The reason, this Court explained, is that allowing plaintiffs to
avoid constitutional protections simply by pleading alternate causes of action for
reputational harm would amount to permitting "an end-run around First
Amendment strictures" that "is foreclosed" by the Supreme Court's decision in
*Hustler Magazine, Inc. v. Falwell*. *Id.* (citation omitted). Put another way, "a
plaintiff may not avoid the protection afforded by the Constitution . . . merely by
the use of creative pleading." *Beverly Hills Foodland, Inc. v. United Food and
Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (noting
that the constitutional fault standard required for an actionable defamation claim
"must equally be met for a tortious interference claim based on the same conduct
or statements"). As another court explained, the law forecloses creative pleading

37

as a means for "end-running other requirements of defamation law." *Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1104-06 (D.D.C. 1991); *see also Desnick v. ABC*, 44 F.3d 1345, 1354 (7th Cir. 1995) (citing *Hustler*, dismissing causes of action for trespass, promissory fraud, invasion of privacy and wiretapping); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) ("claims for product disparagement, or 'trade libel,' and for tortious interference with business relationships" arising from television commentator's remarks concerning plaintiff's product "are subject to the same first amendment requirements that govern actions for defamation").

As he did below, Allen attempts to escape the constitutional infirmities of his tort claims principally by mischaracterizing the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991). Br. at 34-36. In that case, a gubernatorial campaign staffer provided derogatory information about an opposing candidate's running-mate to two newspapers, on the condition that the staffer's identity be kept confidential, after which both newspapers published news reports naming the staffer, which led to his firing by the campaign. The staffer sued over that breach of promise, and the Supreme Court held that even though the staffer could not bring a viable claim for defamation because the challenged statement was true, state law "simply requires those making promises to keep them," and the newspapers "self-imposed" the relevant "restrictions . . . on the publication of

truthful information." *Cohen*, 501 U.S. at 670-71. The decision thus established

the narrow principle that "the First Amendment does not confer on the press a

constitutional right to disregard promises that would otherwise be enforced under

state law." *Id.* at 672.

Allen, however, attempts to transform this narrow holding into a sweeping

rule that any plaintiff can avoid the First Amendment limits on defamation claims

by bringing alternative tort claims arising out of identically challenged speech so

long as those claims seek only "occupational or pecuniary damages." Br. at 33-34.

This theory is presumably premised on the fact that in *Cohen* the plaintiff lost his

campaign job as a result of the broken promise of confidentiality. But the fact that

the plaintiff in *Cohen* suffered "occupational" harm is *incidental* to that holding,

not *essential* to it. Indeed, the Court itself explained that whether damages are

reputational or compensatory has *no* bearing on the First Amendment's

application. *Cohen*, 501 U.S. at 670 ("[T]he characterization of the payment

makes no difference for First Amendment purposes when the law being applied is

a general law that does not single out the press."). The relevant inquiry instead is

whether a claim is based on a "generally applicable law[]," with only incidental

effects on reporting and publishing, or whether it hinges on the "publication of

truthful, lawfully obtained information." *Id*. at 668-69. Here, Allen's tort claims

are all most assuredly the latter, because *the published statements themselves*, not some "generally applicable law," form the basis of these claims.

Because Allen's non-defamation tort claims are based upon truthful, lawfully obtained information, the same constitutional standards that govern his libel claim apply to the tag-along claims as well. And because the Complaint fails to allege facts plausibly establishing an essential element of Allen's claim—namely, material falsity—all claims arising from SPLC's published statements are properly dismissed as a matter of law.

### C.    The First Amendment Bars Allen's Unjust Enrichment Claim

Allen's claim for restitution and unjust enrichment is constitutionally infirm for another wholly separate reason as well. The Supreme Court has left no doubt that the *only* constitutionally sufficient basis on which a state may award damages arising from defamatory speech about a matter of public concern is the compelling governmental interest in compensating plaintiffs for "actual injury" to their reputations. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348-49 (1974) ("[W]e endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation."). More importantly, the Court has emphasized that a state's interest in affording its citizens a cause of action for defamation extends "*no further*" than compensating them for "actual injury" they have sustained as a result of the defamation. *Id.* at 349 (emphasis

40

added).  As the Court explained, "actual injury" is therefore limited to harm

actually sustained by the plaintiff as a result of "impairment of reputation and

standing in the community, personal humiliation, and mental anguish and

suffering."  *Id.* at 350; *see also Milkovich*, 497 U.S. at 23 ("Imperfect though it is,

an action for damages is the only hope for vindication or redress the law gives to a

man [or woman] whose reputation has been falsely dishonored.") (quoting

*Rosenblatt*, 383 U.S. at 93 (Stewart, J., concurring)).

By definition, the "actual injury" limit imposed on defamation damages by

the First Amendment does not extend to the disgorgement of "benefits" allegedly

received by a libel defendant.  Such an award would constitute precisely the kind

of "gratuitous" recovery that, as the Supreme Court held in *Gertz*, "[s]tates have no

substantial interest in securing for plaintiffs."  418 U.S. at 349.  For this reason,

even if state law otherwise allowed such an award, it would violate the First

Amendment.

Here, Allen seeks "restitution" of "[t]he benefits" that SPLC has allegedly

accrued as a result of the Article under an unjust enrichment theory.  J.A.81-82

¶¶ 178-82.  Such a demand has been soundly rejected each time it has previously

been asserted.  Indeed, the Eighth Circuit recently conducted a survey of American

jurisprudence, searching for any case "awarding profits in a defamation case under

an unjust-enrichment theory, or even suggesting money damages are an inadequate

remedy in a public-figure defamation case." *Ventura v. Kyle*, 825 F.3d 876, 887

(8th Cir. 2016). Not surprisingly, it found "none." *Id.* Allen therefore offers no

reason why this Court should be the first to commit such a constitutional error,

even if the claim were not otherwise barred for the reasons above.

## IV.    THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S RICO CLAIMS ON CONSTITUTIONAL AND OTHER GROUNDS

Allen further asserts that Beirich and Potok conspired to and engaged in a

"pattern of racketeering activity," in violation of the RICO Act, 18 U.S.C.

§§ 1962(c) & (d). To establish a violation of RICO under Section 1962(c), a

plaintiff must show he was injured by defendants' (1) conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*,

473 U.S. 479, 496 (1985). To state a claim for RICO conspiracy, a plaintiff "must

show the existence of a RICO 'enterprise' in which the defendant[s] conspired to

participate, and that the defendant[s] conspired that a member of the enterprise

would perform at least two racketeering acts constituting a 'pattern of racketeering

activity.'" *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (citing

*Salinas v. United States*, 522 U.S. 52, 62 (1997)). Thus, a fundamental element of

such claims is showing that substantive RICO violations have occurred—*i.e.*, there

can be no RICO violation or conspiracy without the commission of one or more

predicate offenses defined by the act as "racketeering." *Beck v. Prupis*, 529 U.S.

494, 505-06 (2000) (plaintiff must show injury from "an act that is independently

wrongful under RICO"); 18 U.S.C. § 1961(1) (listing criminal acts that constitute racketeering activity).

Here, the District Court concluded correctly that Allen's RICO claims cannot survive a motion to dismiss both because Allen failed to allege that Beirich and Potok committed any predicate acts, and because Allen failed to allege a pattern of racketeering activity necessary to state a RICO claim.

## A.   Beirich And Potok Did Not Commit Any RICO Predicate Acts

Allen alleges that Beirich and Potok (1) received stolen documents from Dilloway in violation of Alabama law and 18 U.S.C. § 2315; (2) paid Dilloway for those documents in violation of Alabama law and the federal Travel Act, 18 U.S.C. § 1952; and (3) engaged in multiple counts of fraud in violation of 18 U.S.C. §§ 1341 & 1343.  J.A.73-76 ¶¶ 142-51.  Allen also raises fraud claims premised on "depriv[ing] the National Alliance of the honest services of Dilloway," J.A.74 ¶ 145; "falsely stating that plaintiff has 'infiltrated' the Baltimore City Law Department," *id.* ¶ 146; falsely over-stating the number of hate groups in the United States, J.A.74-75 ¶ 147; using a "definition of 'hate group' that is at odds with its widely accepted connotation," J.A.75 ¶ 148; making "intentionally false statements regarding Maajid Nawaz," *id.* ¶ 149; making a "false statement" about whether SPLC engaged in political campaign activities, J.A.75-76 ¶ 150; and making "intentionally false statements about Charles Murray."  J.A.76 ¶ 151.

43

Even taking Allen's assertions at face value, none of these alleged acts can constitute a RICO predicate. SPLC's newsgathering activities with respect to Dilloway are protected under *Bartnicki*, as discussed in Part II, *supra*, and thus they are not criminal offenses as a matter of law. In addition, and even apart from this First Amendment protection, documents without a commercial market are not subject to the National Stolen Property Act and their alleged "theft" accordingly does not amount to a RICO predicate act. *E.g.*, *In re Vericker*, 446 F.2d 244 (2d Cir. 1971). Payment of a news source likewise does not constitute "bribery" under RICO, which is limited to bribery of public officials and witnesses. *See, e.g.*, 18 U.S.C. § 201; *United States v. Ferriero*, 866 F.3d 107, 115-16 (3d Cir. 2017) (state bribery laws must concern integrity of public officials and public actions to constitute RICO predicates). Allen thus cannot base a RICO claim, as a matter of law, on the alleged interactions between SPLC and Dilloway.

That leaves only the fraud allegations arising out of SPLC's supposedly false statements about Allen, hate groups generally, Nawaz, SPLC itself, and Murray. The District Court correctly rejected those statements as RICO predicates because Allen's Complaint provided no "factual support" for the conclusory assertion "that donors are being defrauded by these allegedly false or misleading publications." J.A.183. Allen now argues that this determination "is simply wrong under *Twombly* and its progeny," *see* Br. at 47, but it is in fact a textbook application of

the *Iqbal-Twombly* standard, which provides that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Allen's Complaint simply repeats *ad nauseam* the boilerplate assertion that SPLC published allegedly false statements as part of an "attempt to execute and their execution of a scheme or artifice to defraud donors by deceitful fundraising." J.A.74-76 ¶¶ 146-51. Parroting buzzwords is not enough to "nudge[]" these fraud claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The District Court's conclusion is also correct because these "fraud" claims—all arising out of purportedly false statements that are allegedly injurious to reputation—are at best thinly-disguised defamation claims that cannot give rise to a viable civil RICO action as a matter of law. Indeed, for more than 30 years courts universally have held that alleged acts of defamation—whether pleaded as wire fraud or mail fraud or any other pre-textual claim—are *not* RICO predicate acts. *See, e.g.*, *Hourani v. Mirtchev*, 796 F.3d 1, 10 n.3 (D.C. Cir. 2015) ("defamation and conspiracy to defame . . . are not predicate acts of racketeering under RICO"); *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. & Rest. Emps. Union*, 215 F.3d 923, 927 (9th Cir. 2000) (the purpose of the wire fraud statutes is "to punish wrongful transfers of property . . . not to salve wounded feelings" and harm to reputation); *Michalak v. Edwards*, 124 F.3d 198 (Table),

1997 U.S. App. LEXIS 23928, at *11 (6th Cir. Sept. 9, 1997) ("conspiracy to defame cannot serve as the predicate criminal act necessary for the imposition of civil RICO liability"); *Wegner v. Wells Fargo Bank Nat'l Ass'n*, No. 2:17-cv-1429 JCM (PAL), 2018 U.S. Dist. LEXIS 105412, at *20 (D. Nev. June 25, 2018) ("defamation is not a predicate offense pursuant to RICO"), *aff'd*, 791 F. App'x 669 (9th Cir. 2020); *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 U.S. Dist. LEXIS 32528, at *25 (D. Md. Mar. 17, 2015) ("Courts . . . are universally hostile" to "attempt[s] to 'spin an alleged scheme to harm a plaintiff's professional reputation into a RICO claim.'") (citation omitted) (collecting cases); *Ritchie v. Sempra Energy*, No. 10-cv-1513-CAB (KSC), 2013 U.S. Dist. LEXIS 195688, at *11 n.2 (S.D. Cal. Oct. 15, 2013) ("defamation does not meet the definition of a RICO predicate act") (citation omitted); *Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 169 n.19 (E.D.N.Y. 2010) ("defamation does not meet the definition of a RICO predicate act"), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman*, *Esq.*, 443 F. App'x 582 (2d Cir. 2011); *Lathrop v. Juneau & Assocs., Inc.*, No. 03-CV-0194-DRH, 2005 U.S. Dist. LEXIS 40950, at *24 (S.D. Ill. Apr. 25, 2005) ("defamation cannot constitute a predicate act under RICO"); *Marks v. City of Seattle*, No. C03-1701, 2003 U.S. Dist. LEXIS 22426, at *19-20 (W.D. Wash. Oct. 16, 2003) (dismissing RICO claim because defamation is not a predicate act under RICO); *Mansmann v. Smith*,

No. CIV. A. 96-5768, 1997 U.S. Dist. LEXIS 3411, at *23 (E.D. Pa. Mar. 21, 1997) (same); *Segarra v. Messina*, 153 F.R.D. 22, 28 (N.D.N.Y. 1994) (same); *Manax v. McNamara*, 660 F. Supp. 657, 660 (W.D. Tex. 1987) (defamatory mailings are "in no way a 'fraud'" that can support a RICO claim), *aff'd*, 842 F.2d 808 (5th Cir. 1988).

These principles are so well established that—more than a quarter-century ago—a federal judge warned a plaintiff that it "came perilously close to violating Rule 11" by attempting to construe defamation as wire fraud in order to assert a RICO claim. *Creed Taylor, Inc. v. CBS, Inc.*, 718 F. Supp. 1171, 1180 (S.D.N.Y. 1989). Other courts similarly have cautioned against abusing RICO to seek treble damages for what are at best state-law defamation claims. *See, e.g.*, *Chovanes v. Thoroughbred Racing Ass'n*, No. CIV. A. 99-185, 2001 U.S. Dist. LEXIS 375, at *32 (E.D. Pa. Jan. 18, 2001) ("The RICO statute, which serves a vital role in some situations, should not be used to federalize routine state matters or to award treble damages."); *Kimm v. Chang Hoon Lee*, No. 04 Civ. 5724 (HB), 2005 U.S. Dist. LEXIS 727, at *16-17 (S.D.N.Y. Jan. 13, 2005) (collecting cases and characterizing "the proliferation of alleged RICO claims" as "unfortunate—to say nothing of expensive and time consuming," because they are "frequently an effort to construct a treble damage suit from what, at best, is a civil wrong, something that was never the intention of those who drafted the statute").

Despite Allen's attempt at creative pleading, in other words, the alleged "racketeering activity" here all boils down to (1) obtaining documents from a source and (2) publishing articles about Allen and others, which Allen claims harmed his reputation and career. The former is constitutionally protected newsgathering activity and the latter sounds in defamation, not racketeering. The District Court therefore correctly rejected Allen's RICO and RICO conspiracy claims for failure to allege that Beirich and Potok committed RICO predicate acts. J.A.181-83. As another federal judge similarly noted in rejecting a RICO claim against SPLC arising from its publications, "a plaintiff 'complaining about a defamatory statement cannot end-run the requirements of a defamation claim' by pleading it as a RICO violation." *Ctr. for Immigration Studies*, 410 F. Supp. 3d at 191 (quoting *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014)).

### B.    Allen Also Failed To Allege Any Pattern Of Racketeering Activity

The District Court further held, correctly, that Allen could not state a RICO claim because his allegations as to Dilloway "do[] not show a pattern of racketeering activity." J.A.183. Rather, "[a]t most, these alleged predicate acts constitute one single instance of unlawful activity." *Id.* That follows this Court's rule that "a single scheme perpetrated by [defendants] against a single victim" does *not* amount to "a pattern within the meaning of RICO." *Flip Mortg. Corp. v.*

*McElhone*, 841 F.2d 531, 538 (4th Cir. 1988); *see also Int'l Data Bank v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987) ("To allow a 'pattern of racketeering' to flow from a single, limited scheme such as this one would undermine Congress's intent that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.").

Allen's only response on appeal is to assert that this alleged pattern is "open-ended."  Br. at 49.  But the Supreme Court has explained that an "open-ended" pattern of racketeering activity is one in which "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future." *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).  Here, SPLC's interactions with Dilloway all occurred in the past, and nothing about those interactions plausibly suggests any threat of repetition.  Rather, such a "threat" is *implausible* given that SPLC already possesses and reported on these documents.

As the District Court correctly concluded, Allen's RICO claims cannot survive a motion to dismiss for multiple reasons.  This Court should affirm that dismissal.

## V.    THE DISTRICT COURT CORRECTLY DISMISSED ALLEN'S CONTRACTUAL CLAIMS BECAUSE HE WAS NOT A PARTY TO OR INTENDED BENEFICIARY OF THE RELEVANT CONTRACT

Finally, Allen's Complaint asserted claims for tortious interference with contract (namely the alleged confidentiality agreement between the National

Alliance and Dilloway) and aiding and abetting breach of that same contract. The District Court correctly determined that those claims cannot survive a motion to dismiss because Allen—a non-party to the contract at issue—lacked standing to assert them.

As the District Court recognized, in Maryland "[o]nly parties to the contract or economic relationship have standing to bring a tortious interference claim; third-parties who are affected by the wrongful interference may not recover unless they are intended beneficiaries of the relationship or contract." J.A.183 (quoting *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 540 (D. Md. 2006)). Moreover, "[a]n individual is a third-party beneficiary to a contract" *only* where "the contract was intended for his . . . benefit and it clearly appears that the parties intended to recognize him . . . as the primary party in interest and as privy to the promise." *Id.* (quoting *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457 (2012)). Thus, "[i]t is not enough that the contract merely operates to the individual's benefit: An incidental beneficiary acquires by virtue of the promise *no* right against the promisor or the promisee." *Id.* (emphasis added).

Allen's bald averment that he is an intended third-party beneficiary of an agreement between the National Alliance and its accountant is a conclusory assertion entitled to no weight under *Iqbal-Twombly*. As the District Court noted, Allen does not plead "what the confidentiality agreement allegedly covered, the

circumstances of its insertion into the employment agreement, or any other *facts*

that would support the allegation that [he] was an intended beneficiary of it."

J.A.184 (emphasis added).

On appeal, as below, Allen responds that "it would have been surprising for

the NA *not* to have protected, by means of a confidentiality agreement, third

parties" like Allen "who purchased books, attended conferences, sent money to, or

otherwise connected themselves with the NA."  Br. at 50-51.  But on this point

Allen cites only three out-of-Circuit cases, each of which is wholly inapposite.

First, in *Catalyst Capital Group, Inc. v. Silver Point Capital, L.P.*, a

financial institution plaintiff provided confidential information to an intermediary

that operated a website to share the information with potential investors, and the

defendant visited the website and allegedly used information gleaned from it

against the plaintiff's interest in violation of the website's terms.  No.

CV044001431S, 2005 Conn. Super. LEXIS 1190 (Super. Ct. May 4, 2005) (cited

at Br. at 51).  The court found that plaintiff was an intended third-party beneficiary

of the confidentiality agreement, which ran between the website operator and the

defendant, because as a practical matter the confidential information "belonged" to

plaintiff, not to the intermediary.  *Id.* at *11.  Here, by contrast, Allen has pleaded

*no* facts giving rise to a plausible allegation that the allegedly confidential

51

information at issue—National Alliance's own files and business records—belonged to anyone other than the National Alliance itself.

Second, in *Southridge Capital Management, LLC v. Lowry*, an investment adviser plaintiff shared confidential information with a law firm that subsequently hired the defendant as an expert witness subject to an agreement that he keep confidential any information received in the course of his employment. 188 F. Supp. 2d 388, 396 (S.D.N.Y. 2002) (cited at Br. at 51). Plaintiff alleged that defendant subsequently misused some of that confidential information when he was later retained as an expert in litigation adverse to plaintiff, and the court found that plaintiff was an intended third-party beneficiary of the agreement that ran between the law firm and the defendant because that agreement resulted from "a prior agreement" between the plaintiff and the law firm to keep the plaintiff's information confidential. *Id.* at 397. Here, by contrast, Allen has not alleged the existence of any prior agreement between himself and the National Alliance that would make him the *intended* beneficiary of a subsequent agreement between the white supremacist group and Dilloway.

Third, in *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, plaintiffs and defendants *all* agreed to non-disclosure agreements as a condition of attending an annual conference held by the National Abortion Federation, and plaintiffs alleged that defendants broke those agreements

by surreptitiously recording conversations with plaintiffs at the conference and then publishing those recordings online.  214 F. Supp. 3d 808 (N.D. Cal. 2016) (cited at Br. at 51).  The court concluded that the plaintiffs were intended third-party beneficiaries of these non-disclosure agreements between the conference organizer and the defendants because plaintiffs "have alleged plausible facts showing the intent to consider plaintiffs as third-party beneficiaries of the NAF confidentiality agreements," namely that, "[a]s alleged, the explicit purpose of the [conference] confidentiality agreements was to provide confidentiality and ensure security for the attendees, and the language of the agreements considered in full bears out that intent," because "[e]ven though plaintiffs were not specifically identified in the agreements, they are included within the class of 'people' who were required to sign and abide by, and as a result receive protection from, the [conference] confidentiality agreements."  *Id.* at 832.  Here, by contrast, Allen has pleaded no facts, let alone *plausible* facts, alleging that the *intent* of the agreement between the National Alliance and Dilloway was to consider Allen a third-party beneficiary.

Rather than supporting his argument, therefore, these three cases illustrate how vast the distance is between Allen's Complaint and a plausible allegation of intended third-party beneficiary status.  At bottom, Allen alleges that the National Alliance hired Dilloway to "liv[e] on and maintain[]" its West Virginia property

and to "organiz[e] and assess[] the financial and business records on the property," and that Dilloway signed an "employment agreement" to that effect containing "confidentiality provisions." J.A.34 ¶¶ 55-56. That does not suffice to allege plausibly that these "confidentiality provisions" were intended for the benefit of anyone other than the organization itself—let alone that they were *specifically* intended for the benefit of any *particular* National Alliance member, Allen included. At most, Allen has pleaded that the agreement *incidentally* benefited him because he wished to keep his affiliation with the group confidential. As a matter of Maryland law, however, the mere fact that the agreement may "operate[] to [his] benefit" is *not* sufficient to make him an intended third party beneficiary. *CR-RSC Tower I,* 429 Md. at 457.

The District Court properly dismissed Allen's contractual claims because he was not an *intended* third-party beneficiary of that contract. This Court should affirm on the same basis. Alternately, because Allen's alleged harms arising from his contract claims—*i.e.*, "the loss of his employment at the city of Baltimore and severe damage to his *reputation* as an attorney," J.A.79 ¶ 170, J.A.85 ¶ 197 (emphasis added)—could only have flowed from the publication of the Article, the First Amendment bars these claims as well. *See* Part III.B, *supra.*

54

## **CONCLUSION**

For all the foregoing reasons, SPLC respectfully requests that this Court

affirm the dismissal of Allen's Complaint with prejudice under Rule 12(b)(6).

Dated: April 2, 2020                    Respectfully submitted,

                                        BALLARD SPAHR LLP

                                        */s/ Chad R. Bowman*
                                        Chad R. Bowman
                                        Elisabeth R. Connell
                                        Maxwell S. Mishkin
                                        1909 K Street NW, 12th Floor
                                        Washington, DC 20006
                                        Tel: 202-661-2200
                                        Fax: 202-661-2299
                                        bowmanchad@ballardspahr.com
                                        connelle@ballardspahr.com
                                        mishkinm@ballardspahr.com

                                        *Counsel for Defendants-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B) because, as determined by the "word count" feature of Microsoft Word 2016, the brief contains 12,884 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(5)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman.

Dated:    April 2, 2020                              *s/ Chad R. Bowman*
                                                                  Chad R. Bowman

## **CERTIFICATE OF SERVICE**

I certify that on April 2, 2020, the foregoing was served on counsel of record

for all parties and *amici* through the CM/ECF system.

Dated:    April 2, 2020              */s/ Chad R. Bowman*
                                     Chad R. Bowman