**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 19-2419**

———————————

GLEN K. ALLEN,

                Plaintiff - Appellant,

      v.

HEIDI BEIRICH; MARK POTOK; THE SOUTHERN POVERTY LAW CENTER, INC.,

                Defendants - Appellees,

-------------------------------

DEFEND LIFE, INC. OF MARYLAND; FITZGERALD GRIFFIN FOUNDATION; THE HON. LARRY PRATT; THE H.L. MENCKEN CLUB; PUBLIC ADVOCATE OF THE UNITED STATES, INC.,

                Amici Supporting Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, Senior District Judge.  (1:18−cv−03781−CCB)

———————————

Argued:  January 26, 2021                               Decided:  July 12, 2021

———————————

Before MOTZ, AGEE, and KEENAN, Circuit Judges.

———————————

Affirmed in part, vacated in part, and remanded with instructions by unpublished opinion. Judge Keenan wrote the opinion, in which Judge Motz and Judge Agee joined.

———————————

**ARGUED:** Glen K. Allen, Baltimore, Maryland, Appellant Pro Se. Chad Russell Bowman, BALLARD SPAHR LLP, Washington, D.C., for Appellees. **ON BRIEF:** Frederick C. Kelly, III, LAW OFFICE OF FREDERICK C. KELLY, Monroe, New York, for Appellant. Elisabeth R. Connell, Maxwell S. Mishkin, BALLARD SPAHR LLP, Washington, D.C., for Appellees. Charles G. Mills, Front Royal, Virginia, for Amici Curiae.

———————

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

This appeal primarily concerns (1) whether the plaintiff has standing to challenge an organization's tax-exempt status under the Internal Revenue Code, and (2) the plaintiff's claim for defamation-related damages resulting from an organization's publication of certain negative information about him.  The plaintiff, Glen Allen, sued the Southern Poverty Law Center, Inc. (the SPLC) and two of its employees, Heidi Beirich and Mark Potok (collectively, the defendants), for issuing two publications highlighting Allen's affiliation with the National Alliance (NA), a white supremacist group.  Based on one of these publications, Allen was fired from his position as an attorney for the City of Baltimore Law Department (the Law Department).  In his complaint, Allen alleged numerous claims against the defendants, including seeking damages under state law for defamation and a declaratory judgment that the SPLC misused its tax-exempt status granted under the Internal Revenue Code.

The district court dismissed Allen's complaint under Federal Rule of Civil Procedure 12(b)(6).  The court reasoned that the SPLC's publications were protected under the First Amendment, that Allen could not challenge the SPLC's tax-exempt status in Maryland district court, and that Allen had failed to allege facts supporting his remaining claims.  Upon our review, we agree with the district court and hold that Allen's claims fail as a matter of law.

I.

3

In February 2016, Allen began working as an attorney for the Law Department.[1]  In that capacity, Allen defended the City of Baltimore (the City) in a lawsuit brought by a Black man who alleged that he had been wrongfully convicted of murder and had spent 19 years in prison for that crime.

In August 2016, the SPLC published an article titled "Neo-Nazi Lawyer Represents Baltimore in Suit Over Wrongful Arrest and 19-Year Imprisonment of Black Man" (the Article).  The Article began:

> Baltimore is at the epicenter of the national debate over police violence, particularly after last week's release of a Justice Department report documenting deep racial disparities in policing in the city.  That makes it particularly surprising, if not bizarre, to find a well-known neo-Nazi lawyer serving in the city's Law Department and defending the Baltimore Police Department.

The Article described Allen as having a "deep" "history with organized racism and anti-Semitism," and identified him as the NA's attorney.  The Article also included copies of receipts for dues payments that Allen had made to the NA, as well as evidence of Allen's attendance at a "Holocaust Revisionist Conference."   The City terminated Allen's employment contract soon after the SPLC published the Article.

In 2017, the SPLC published a "Hate Map" (the Hate Map), which depicted a map of the United States and the location of more than 900 "active hate groups" identified by the SPLC.  The Hate Map also included a photograph of Allen bearing the caption

---

[1] Because the district court dismissed Allen's complaint for failure to state a claim under Rule 12(b)(6), we recount the facts as alleged in the complaint.  *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 317 n.2 (4th Cir. 2017).

4

"Exposing Racists Who Infiltrate Public Institutions."  Below the caption was a paragraph that read:

> Hate group members and followers of their ideologies sometimes manage to obtain important positions of power.  When the city of Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew of his involvement with white supremacist groups, except for us.  Because of our investigation and exposé, he was swiftly fired.

The SPLC obtained the information used in the Article and the Hate Map from Randolph Dilloway, a former accountant employed by the NA.  In May 2015, Dilloway scanned thousands of confidential NA documents (the Dilloway documents) and illegally removed them from the NA's West Virginia office.  Allen alleged that Dilloway later sold the documents to the SPLC for more than $5,000, and that the SPLC knew at the time of the sale that the documents were stolen.

Allen filed a nine-count complaint against the SPLC and two of its employees in the district court for the District of Maryland.  In Count 1, Allen sought a declaratory judgment that the SPLC misused its tax-exempt status authorized under section 501(c)(3) of the Internal Revenue Code by, among other things, paying for and receiving the stolen Dilloway documents.  In Counts 2 and 3, Allen alleged that the defendants violated the Racketeering Influenced Corrupt Organizations Act (RICO), in part based on the SPLC's receipt of the documents from Dilloway and the allegedly false statements about Allen contained in the Article and the Hate Map.  Allen also alleged several state law claims, including tortious interference with his contract with the Law Department, negligent training and supervision of the SPLC's employees, unjust enrichment, defamation, and claims related to Dilloway's breach of his confidentiality agreement with the NA.  In a

5

detailed opinion, the district court rejected Allen's claims and dismissed the complaint under Rule 12(b)(6). Allen now appeals.

## II.

We review de novo the district court's decision granting a motion to dismiss. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). In examining the court's dismissal of a complaint under Rule 12(b)(6), we "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id*. (citation omitted). We address each of Allen's claims in turn.

## A.

Allen first argues that the district court erred in dismissing his request for declaratory judgment on the ground that his challenge to the SPLC's tax-exempt status could not be brought in federal district court in Maryland. The district court held that under the Declaratory Judgment Act, 28 U.S.C. § 2201, suits "with respect to Federal taxes" that implicate an organization's tax-exempt status under section 501(c)(3) of the Internal Revenue Code must be filed in one of three courts designated in 26 U.S.C. § 7428. We do not reach these arguments regarding the merits, however, because we conclude that Allen did not have Article III standing to bring his claim under the Declaratory Judgment Act.

Although the district court did not address the issue of Allen's standing, we are required to assure ourselves of our jurisdiction. *Trump v. Hawaii*, 138 S. Ct. 2392, 2415-16 (2018). At the motion-to-dismiss stage, we accept the allegations in the complaint as true to determine whether the plaintiff has alleged facts sufficient to establish standing. *See*

6

*Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (explaining

standing inquiry at motion-to-dismiss stage); *see also Hollingsworth v. Perry*, 570 U.S.

693, 700, 715 (2013) (holding that it is the plaintiff's burden to establish his standing). The

"irreducible constitutional minimum" of standing requires a showing of 1) a "concrete and

particularized" injury, 2) that is "fairly traceable" to the defendant's challenged conduct,

and 3) that is redressable by a favorable decision of the court. *Spokeo, Inc. v. Robins*, 136

S. Ct. 1540, 1547-48 (2016) (citation omitted). An injury is redressable if it is likely, and

not merely speculative, that the plaintiff "personally would benefit in a tangible way from

the court's intervention." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir.

2018) (citation omitted).

We conclude that Allen has failed to establish a redressable injury as required for

Article III standing. Allen claims that he was harmed because the SPLC's tax-exempt

status enabled it to raise funds and "reach wide audiences" for its publications, thereby

damaging his reputation and leading to his termination. This proposed causal link between

Allen's injury and the SPLC's tax burden is tenuous at best. Allen does not offer a plausible

basis on which to conclude that Baltimore would have continued his employment had the

SPLC not been a section 501(c)(3) organization. For the same reasons, the declaration

Allen seeks in order to invalidate the SPLC's tax-exempt status would not redress his

asserted injury by restoring his reputation or reinstating his employment with Baltimore.

We therefore conclude that Allen lacked standing to bring his Declaratory Judgment Act

claim, and that the district court properly dismissed that claim. However, because

dismissals for lack of jurisdiction should be without prejudice, we vacate the court's

7

judgment with respect to Count 1 and remand with instructions to dismiss that count without prejudice. *See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013).

B.

In Count 8 of his complaint, Allen alleged a defamation claim against the defendants based on the caption accompanying his photo in the Hate Map, which stated "Exposing Racists Who Infiltrate Public Institutions." According to Allen, by describing him as "infiltrat[ing]" the Law Department, the defendants falsely accused Allen of being unethical and incompetent as an attorney.[2] Thus, Allen objects to the district court's conclusion that the challenged statement was non-actionable hyperbole. We agree with the district court that the SPLC's statement was protected by the First Amendment and, therefore, could not support a defamation claim.[3]

The First Amendment protects "statements that cannot reasonably be interpreted as stating actual facts about an individual." *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008). Accordingly, a state law defamation claim is not actionable if the challenged statement was merely "rhetorical hyperbole," or "loose, figurative, or hyperbolic language." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 17, 21 (1990) (citation

---

[2] On appeal, Allen clarifies that his defamation claim does not depend on the SPLC's description of Allen in the Hate Map as a "neo-Nazi" or a "racist." Allen also does not base his defamation claim on the Article. Accordingly, we focus our analysis on the SPLC's use of the word "infiltrate" in the Hate Map.

[3] Because we conclude that the challenged statement was non-actionable hyperbole, we do not address Allen's other challenges to the district court's reasoning regarding his defamation claim.

omitted). The "general tenor" of such rhetorical speech, together with the specific language used, "sufficiently negates any impression that the speaker is asserting actual facts," thus precluding a defamation claim. *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009).

We conclude that the Hate Map's description of Allen as "infiltrat[ing]" the City government amounts to "loose, figurative, or hyperbolic language" that "cannot reasonably be interpreted" as stating a fact about Allen's ethics or competence as an attorney. *CACI Premier Tech., Inc.*, 536 F.3d at 293 (quoting *Milkovich*, 497 U.S. at 17, 21). Immediately underneath the challenged caption, the Hate Map described Allen as being "hired" by the Law Department, descriptive language that plainly contrasts with the rhetorical flourish used in the challenged caption. Looking to the broader context of the Hate Map, the SPLC generally employed language in its captions to convey "a lusty and imaginative expression of [] contempt" for the individuals and organizations described. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 286 (1974). The Hate Map overall is entitled, "White Supremacists Celebrate Trump's Victory." Other captions in the document contain hyperbolic language akin to the challenged caption, including "Taking Down the Imperial Klans of America" and "Making the Klan Pay in South Carolina." Given the "context and general tenor" of the Hate Map and the specific terms used to describe Allen, we conclude that the challenged statement is non-actionable hyperbole. *Snyder*, 580 F.3d at 219.

### C.

We turn to consider Allen's tort claims alleged in Counts 4, 6, and 7 of the complaint (the non-defamation tort claims). In these counts, Allen asserted that the SPLC and one of

9

its employees intentionally interfered with Allen's employment contract by publishing the Article, and that the SPLC's failure to train and supervise its employees caused the employees to engage in the illegal receipt of the Dilloway documents. Allen also alleged a claim of unjust enrichment against the SPLC based on its publication of the Article. All these claims arise from Allen's underlying allegation that the defendants illegally participated in the theft of the Dilloway documents leading to publication of the Article. Like Allen's defamation claim, the district court rejected the non-defamation tort claims as protected by the First Amendment.

Addressing these claims, Allen primarily asserts that the district court erred in its application of *Bartnicki v. Vopper*, 532 U.S. 514 (2001), which extended First Amendment protection to entities and persons publishing truthful information on a matter of public concern that a source obtained unlawfully, provided that the publisher itself was not involved in the unlawful activity. *Id.* at 517-18, 535. According to Allen, the SPLC "participated in" the theft of the Dilloway documents from the NA and, thus, the defendants' use of those documents is not protected under *Bartnicki*. We disagree with Allen's position.

We first observe that Allen may not bypass the strictures of the First Amendment, including the principles set forth in *Bartnicki*, by seeking publication damages for non-defamation tort claims. *See Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522-24 (4th Cir. 1999) (citing *Hustler Mag. v. Falwell*, 485 U.S. 46 (1988)); *see also Snyder*, 580 F.3d at 218 (noting that "regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional

10

injury allegedly resulting from the defendant's speech"). In other words, by claiming damages caused by an act of publication, Allen's tort claims must satisfy the same constitutional requirements applicable to his underlying defamation claim. *Food Lion*, 194 F.3d at 522-24.

As the district court recognized, the Supreme Court's decision in *Cohen v. Cowles Media Company*, 501 U.S. 663 (1991), does not shield Allen's non-defamation tort claims from First Amendment scrutiny. In *Cohen*, the Court held that a plaintiff could recover damages from a publisher that had breached a promise of confidentiality to him, causing the plaintiff to be terminated from his job. *Id.* at 665, 671. The Court reasoned that the plaintiff was not attempting "to avoid the strict requirements for establishing a libel or defamation claim" by seeking damages for injury to his reputation. *Id.* at 671. Nor could the plaintiff have done so, as the information that was published—his name—was true. *Id.*

Here, in contrast, Allen did not have a preexisting agreement with the defendants and, thus, did not allege any injury flowing from the breach of such an agreement. Rather, Allen was fired from his job with the Law Department as a result of the harm to his reputation caused by the SPLC's publication of the Article. Thus, Allen cannot seek redress for this reputational harm without meeting the First Amendment standards applicable to his underlying defamation claim.

We therefore proceed to apply the First Amendment principles of *Bartnicki* to Allen's non-defamation tort claims. The Supreme Court long has recognized that the First Amendment generally protects publication of truthful information that a publisher "lawfully obtains . . . about a matter of public significance," even if disclosure of that

11

information was prohibited under state law, absent "a state interest of the highest order." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103-04 (1979); *see also New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (affirming First Amendment protection for newspapers' publication of classified Pentagon Papers unlawfully disclosed by a third party); *Cohen*, 501 U.S. at 669 ("[T]he truthful information sought to be published must have been lawfully acquired."). Proceeding one step further, the Court in *Bartnicki* considered whether the same principle applies when a publisher obtains information "in a manner lawful in itself but from a source who has obtained it unlawfully," and the publisher later publishes that information. 532 U.S. at 528. The Court concluded that the illegal conduct of that source of information "[did] not suffice to remove the First Amendment shield from speech about a matter of public concern," even if the publisher knew, or had reason to know, that the information was obtained unlawfully. *Id.* at 517-18, 535.

We agree with the district court that the defendants' use of the Dilloway documents is subject to the First Amendment protection set forth in *Bartnicki*. Allen has not plausibly alleged that the defendants were complicit in Dilloway's theft of the documents from the NA. According to the complaint, Dilloway removed the documents from the NA office on May 3, 2015, but did not contact the SPLC regarding the documents until three days later, on May 6, 2015. The complaint lacks any factual allegation that the SPLC was even in contact with Dilloway before the theft, much less that the SPLC was aware of Dilloway's

plans in advance or in any way participated in Dilloway's unlawful conduct.[4]  *See Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 435-36 (S.D.N.Y. 2019) (rejecting plaintiff's argument that publisher could "be held liable for the theft as an after-the-fact coconspirator of the stolen documents," because such a rule would "eviscerate *Bartnicki*" and render any publisher of stolen information a coconspirator in the theft).

We reject as frivolous Allen's assertion that his membership in the NA, as reflected in the Dilloway documents, was not a matter of public concern.  An attorney's involvement in a white supremacist organization while representing the City, particularly in a case involving a Black citizen's claim of wrongful conviction and incarceration, plainly is "fairly considered as relating to any matter of political, social, or other concern to the community" and is "a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted).  Accordingly, we conclude that the SPLC's publication of information from the Dilloway documents was protected under the First Amendment.  We therefore affirm the district court's dismissal of Counts 4, 6, and 7 of the complaint.[5]

---

[4] We similarly are not persuaded by Allen's contention that the SPLC participated in Dilloway's unlawful conduct by allegedly paying him more than $5,000 for the documents.  Allen does not plausibly allege that any such payment was offered or given to Dilloway before he took the documents.

[5] For the same reasons, we conclude that the district court properly rejected the RICO claims alleged in Counts 2 and 3 of the complaint.  Although Allen alleged a litany of purportedly illegal and fraudulent racketeering conduct by the defendants, many of these allegations were based on the defendants' receipt of the Dilloway documents described above.  And to the extent that Allen alleged that the SPLC made misleading statements to its donors, we agree with the district court that these allegations of fraud were not plausibly

D.

Finally, we conclude that the district court properly dismissed Counts 5 and 9 of the complaint. In those counts, Allen alleged that the defendants tortiously interfered with Dilloway's confidentiality agreement with the NA and aided and abetted Dilloway's breach of that agreement. Both claims depended on Allen's assertion that he was an intended third-party beneficiary of Dilloway's agreement with the NA. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (Md. 2012) (explaining that a merely "incidental beneficiary" of a contract "acquires . . . no right against the promisor or the promisee." (citation omitted)). While the complaint alleged that Dilloway entered into an employment contract containing confidentiality provisions with the NA, the complaint did not contain any plausible allegations that the parties intended for that agreement to benefit Allen. As the district court explained, "[t]he complaint does not state what the confidentiality agreement allegedly covered, the circumstances of its insertion into the employment agreement, or any other facts that would support the allegation that Allen was an intended beneficiary of it." Accordingly, we affirm the district court's dismissal of Counts 5 and 9.[6]

III.

---

pleaded. In sum, the actions alleged by Allen do not amount to the "organized, long-term, habitual criminal activity" covered by the RICO statute. *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted).

[6] Allen raises various other arguments on appeal, which we reject as lacking merit.

14

For these reasons, we conclude that the district court did not err in dismissing Allen's complaint. We therefore vacate the district court's judgment with respect to Count 1 and remand that count for dismissal without prejudice, and affirm the balance of the district court's judgment.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*